(Slip Opinion) OCTOBER TERM, 2018 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FOOD MARKETING INSTITUTE *v.* ARGUS LEADER MEDIA, DBA ARGUS LEADER

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 18–481. Argued April 22, 2019—Decided June 24, 2019

Respondent Argus Leader Media filed a Freedom of Information Act (FOIA) request with the United States Department of Agriculture (USDA), seeking the names and addresses of all retail stores that participate in the national food-stamp program—known as the Supplemental Nutrition Assistance Program (SNAP)—and each store's annual SNAP redemption data from fiscal years 2005 to 2010. The USDA declined to disclose the store-level SNAP data, invoking FOIA's Exemption 4, which shields from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential," 5 U. S. C. §552(b)(4). Argus Leader sued the USDA. Following circuit precedent, the District Court employed the "competitive harm" test, under which commercial information cannot be deemed "confidential" unless disclosure is "likely . . . to cause substantial harm to the competitive position of the person from whom the information was obtained." The court agreed that revealing store-level SNAP data could work some competitive harm, but it could not say that disclosure would cause "substantial competitive harm," and thus ordered disclosure. Petitioner Food Marketing Institute, a trade association representing grocery retailers, intervened and filed an appeal. The Eighth Circuit affirmed, rejecting the Institute's argument that the court should discard the "substantive competitive harm" test in favor of the ordinary public meaning of the statutory term "confidential."

*Held*:

   1. The Institute has standing to appeal. Disclosure of the contested data would cause its members some financial injury in the highly competitive grocery industry; this concrete injury is directly traceable

Syllabus

to the judgment ordering disclosure; and a favorable ruling from this Court would redress the retailers' injury by reversing that judgment. Pp. 4–5.

2. Where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is "confidential" within Exemption 4's meaning. Pp. 5–12.

(a) At the time of FOIA's enactment, the term "confidential" meant "private" or "secret." Contemporary dictionaries suggest two conditions that might be required for information communicated to another to be considered confidential: when the information is customarily kept private, or at least closely held, by the person imparting it; and when the party receiving the information provides some assurance that it will remain secret. At least the first of these conditions must be met; it is hard to see how information could be deemed confidential if its owner shares it freely. But the Court need not resolve whether both conditions are necessary because both conditions are clearly met here. Uncontested testimony established that the Institute's retailers customarily do not disclose store-level SNAP data or make it publicly available. And to induce retailers to participate in SNAP and provide store-level information, the government has long promised retailers that it will keep their information private. Early courts of appeals confronting Exemption 4 interpreted its terms in ways consistent with these understandings. Pp. 5–7.

(b) Argus Leader pins its hopes on the "substantial competitive harm" requirement from the D. C. Circuit's decision in *National Parks & Conservation Assn.* v. *Morton*, 498 F. 2d 765. There, the court inappropriately resorted to legislative history before consulting the statute's text and structure and relied heavily on statements from witnesses in congressional hearings years earlier on a different bill that was never enacted into law. Unsurprisingly, *National Parks* has drawn considerable criticism over the years, and even the D. C. Circuit has distanced itself from the decision. Pp. 7–10.

(c) Argus Leader's attempt to salvage *National Parks* is unpersuasive. First, it rearranges the text of Exemption 4 to create a phrase that does not appear in the statute: "confidential commercial information." It suggests that this synthetic term mirrors a preexisting common law term of art that covers only information whose release would lead to substantial competitive harm, but points to no treatise or case decided before Exemption 4's adoption that assigned any such meaning to the terms actually before the Court. Nor will this Court ordinarily imbue statutory terms with a specialized common law meaning when Congress has not itself invoked the common law terms of art associated with that meaning. See, *e.g.*, *Bruesewitz*

v. *Wyeth LLC*, 562 U. S. 223, 233–235. Alternatively, the company suggests that Congress effectively ratified its understanding of the term "confidential" by enacting similar phrases in other statutes in the years since *National Parks* was decided. But the ratification canon applies when Congress re-enacts the same statute using the same language, and Congress has never re-enacted Exemption 4. Finally, Argus Leader urges the Court to adopt a "substantial competitive harm" requirement as a matter of policy because it believes FOIA exemptions should be narrowly construed. But the Court cannot arbitrarily constrict Exemption 4 by adding limitations found nowhere in its terms. Pp. 10–12.

889 F. 3d 914, reversed and remanded.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, KAGAN, and KAVANAUGH, JJ., joined. BREYER, J., filed an opinion concurring in part and dissenting in part, in which GINSBURG and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
preliminary print of the United States Reports.  Readers are requested to
notify the Reporter of Decisions, Supreme Court of the United States, Wash-
ington, D. C. 20543, of any typographical or other formal errors, in order
that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 18–481

## FOOD MARKETING INSTITUTE, PETITIONER *v.* ARGUS LEADER MEDIA, DBA ARGUS LEADER

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT*

[June 24, 2019]

JUSTICE GORSUCH delivered the opinion of the Court.

Congress has instructed that the disclosure re-
quirements of the Freedom of Information Act do "not
apply" to "confidential" private-sector "commercial or
financial information" in the government's possession.
But when does information provided to a federal agency
qualify as "confidential"?  The Food Marketing Institute
says it's enough if the owner keeps the information private
rather than releasing it publicly.  The government
suggests that an agency's promise to keep information
from disclosure may also suffice to render it confidential.
But the courts below imposed a different requirement yet,
holding that information can never be deemed confidential
unless disclosing it is likely to result in "substantial
competitive harm" to the business that provided it.
Finding at least this "competitive harm" requirement
inconsistent with the terms of the statute, we reverse.

I

This case began when Argus Leader, a South Dakota
newspaper, filed a FOIA request for data collected by the
United States Department of Agriculture.  The USDA

administers the national food-stamp program, known as the Supplemental Nutrition Assistance Program. Argus Leader asked the USDA for the names and addresses of all retail stores that participate in SNAP and each store's annual SNAP redemption data from fiscal years 2005 to 2010, which we refer to as "store-level SNAP data." The USDA tried to meet the paper halfway. It released the names and addresses of the participating stores but declined to disclose the requested store-level SNAP data. As relevant here, the USDA invoked FOIA's Exemption 4, which shields from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U. S. C. §552(b)(4).

Unsatisfied by the agency's disclosure, Argus sued the USDA in federal court to compel release of the store-level SNAP data. Like several other courts of appeals, the Eighth Circuit has engrafted onto Exemption 4 a so-called "competitive harm" test, under which commercial information cannot be deemed "confidential" unless disclosure is "likely . . . to cause substantial harm to the competitive position of the person from whom the information was obtained." *Argus Leader Media* v. *United States Dept. of Agriculture*, 889 F. 3d 914, 915 (2018) (internal quotation marks omitted). So the district court held a two-day bench trial to determine whether disclosure of the store-level SNAP data would cause substantial competitive harm to participating retailers.

At trial, witnesses for the USDA testified that retailers closely guard store-level SNAP data and that disclosure would threaten stores' competitive positions. They explained that retailers use models of consumer behavior to help choose new store locations and to plan sales strategies. Competitors' estimated sales volumes represent an important component of these models and can be time consuming and expensive to generate. And a

model's accuracy and utility increase significantly if it includes a rival's actual sales data rather than mere estimates. So disclosure of store-level SNAP data could create a windfall for competitors: Stores with high SNAP redemptions could see increased competition for SNAP customers from existing competitors, new market entrants could use SNAP data to determine where to build their stores, and SNAP-redemption data could be used to discern a rival retailer's overall sales and develop strategies to win some of that business too. For its part, Argus Leader offered no fact witnesses and did not dispute that retailers customarily keep this data private or that it bears competitive significance. Instead, the company contended that any competitive harm associated with disclosure would not be substantial. In the end, the district court agreed; while "[c]ompetition in the grocery business is fierce," and while the record supported the conclusion that revealing store-level SNAP data could work some competitive harm, the court could not say that disclosure would rise to the level of causing "*substantial* competitive harm," and thus ordered disclosure. *Argus Leader Media* v. *United States Dept. of Agriculture*, 224 F. Supp. 3d 827, 833–835 (SD 2016) (emphasis added).

The USDA declined to appeal, but it alerted the retailers who had provided the data so that they could consider intervening to pursue the case further. The Food Marketing Institute, a trade association representing grocery retailers, answered the call. It successfully moved to intervene under Federal Rule of Civil Procedure 24(a) and then filed its own appeal. Meanwhile, the USDA assured the district court that it would not disclose the retailers' data pending appeal. Before the Eighth Circuit, the Institute argued that the court should discard the "substantial competitive harm" test and apply instead the ordinary public meaning of the statutory term "confidential." The court rejected that argument and

affirmed. We granted the Institute a stay of the Eighth Circuit's mandate and, later, its petition for certiorari. 585 U. S. ___ (2018); 586 U. S. ___ (2019).

## II

Before turning to the merits, we confront a threshold challenge to our jurisdiction: Argus Leader questions whether the Institute has standing to pursue this appeal. To show standing under Article III, an appealing litigant must demonstrate that it has suffered an actual or imminent injury that is "fairly traceable" to the judgment below and that could be "redress[ed] by a favorable ruling." *Monsanto Co.* v. *Geertson Seed Farms*, 561 U. S. 139, 149–150 (2010).

The Institute satisfies each of these criteria. Whether or not disclosure of the contested data would cause its member retailers "substantial competitive harm," the record before us reveals (and Argus Leader does not meaningfully dispute) that disclosure likely would cause them *some* financial injury. As the Eighth Circuit observed, the grocery industry is "highly competitive," and disclosure of store-level SNAP data likely would help competitors win business from the Institute's members. 889 F. 3d, at 916. This concrete injury is, as well, directly traceable to the judgment ordering disclosure. And a favorable ruling from this Court would redress the retailers' injury by reversing that judgment.

Argus Leader insists that the Institute's injury is not redressable because a favorable ruling would merely restore the government's *discretion* to withhold the requested data under Exemption 4, and it might just as easily choose to provide the data anyway. But the government has represented unequivocally that, consistent with its longstanding policy and past assurances of confidentiality to retailers, it "will not disclose" the contested data unless compelled to do so by

the district court's order. Brief for United States as *Amicus Curiae* 35; accord, Tr. of Oral Arg. 18–22. A reversal here thus would ensure exactly the relief the Institute requests. That is enough to satisfy Article III. *Monsanto*, 561 U. S., at 152–153.

## III
### A

As we've seen, Exemption 4 shields from mandatory disclosure "commercial or financial information obtained from a person and privileged or confidential." 5 U. S. C. §552(b)(4). But FOIA nowhere defines the term "confidential." So, as usual, we ask what that term's "ordinary, contemporary, common meaning" was when Congress enacted FOIA in 1966. *Perrin* v. *United States*, 444 U. S. 37, 42 (1979). We've done the same with other undefined terms in FOIA. See, *e.g.*, *Milner* v. *Department of Navy*, 562 U. S. 562, 569 (2011); *United States* v. *Weber Aircraft Corp.*, 465 U. S. 792, 804 (1984).

The term "confidential" meant then, as it does now, "private" or "secret." Webster's Seventh New Collegiate Dictionary 174 (1963). Contemporary dictionaries suggest two conditions that might be required for information communicated to another to be considered confidential. In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it. See, *e.g.*, Webster's Third New International Dictionary 476 (1961) ("known only to a limited few" or "not publicly disseminated"); Black's Law Dictionary 370 (rev. 4th ed. 1968) ("intended to be held in confidence or kept secret"). In another sense, information might be considered confidential only if the party receiving it provides some assurance that it will remain secret. See, *e.g.*, 1 Oxford Universal Dictionary Illustrated 367 (3d ed. 1961) ("spoken or written in confidence"); Webster's New World

Dictionary 158 (1960) ("told in confidence").

Must both of these conditions be met for information to be considered confidential under Exemption 4?  At least the first condition has to be; it is hard to see how information could be deemed confidential if its owner shares it freely.   And there's no question that the Institute's members satisfy this condition; uncontested testimony established that the Institute's retailers customarily do not disclose store-level SNAP data or make it publicly available "in any way."  See, *e.g.,* App. 93–94. Even within a company, witnesses testified, only small groups of employees usually have access to it.  But what about the second condition: Can privately held information *lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private?  As it turns out, there's no need to resolve that question in this case because the retailers before us clearly satisfy this condition too.   Presumably to induce retailers to participate in SNAP and provide store-level information it finds useful to its adminstration of the program, the government has long promised them that it will keep their information private.  See, *e.g.*, 43 Fed. Reg. 43275 (1978); see also Brief for United States as *Amicus Curiae* 27–30.

Early courts of appeals confronting Exemption 4 interpreted its terms in ways consistent with these understandings.  In *GSA* v. *Benson*, 415 F. 2d 878, 881 (1969), for example, the Ninth Circuit concluded that Exemption 4 would "'protect information that a private individual wishes to keep confidential for his own purposes, but reveals to the government under the express or implied promise'" of confidentiality.  The D. C. Circuit similarly held that Exemption 4 covered sales documents "'which would customarily not be released to the public'" and which the government "agreed to treat . . . as confidential."  *Sterling Drug Inc.* v. *FTC*, 450 F. 2d 698,

709 (1971); see also *Grumman Aircraft Eng. Corp.* v. *Renegotiation Bd.*, 425 F. 2d 578, 580, 582 (1970) (information a private party "submitted 'in confidence'" or "would not reveal to the public [is] exempt from disclosure").

B

Notably lacking from dictionary definitions, early case law, or any other usual source that might shed light on the statute's ordinary meaning is any mention of the "substantial competive harm" requirement that the courts below found unsatisfied and on which Argus Leader pins its hopes. Indeed, when called on some years ago to interpret the similar phrase "information furnished by a confidential source" in FOIA Exemption 7(D), §552(b)(7)(D), this Court looked, as we do now, to "common usage" and never suggested that the government must prove that the disclosure of a source's information would result in substantial harm. *Department of Justice* v. *Landano*, 508 U. S. 165, 173–174 (1993).

So where *did* the "substantial competitive harm" requirement come from? In 1974, the D. C. Circuit declared that, in addition to the requirements actually set forth in Exemption 4, a "court must also be satisfied that non-disclosure is justified by the legislative purpose which underlies the exemption." *National Parks & Conservation Assn.* v. *Morton*, 498 F. 2d 765, 767. Then, after a selective tour through the legislative history, the court concluded that "commercial or financial matter is 'confidential' [only] if disclosure of the information is likely . . . (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Id.*, at 770. Without much independent analysis, a number of courts of appeals eventually fell in line and adopted variants of the

*National Parks* test.   See *Contract Freighters, Inc.* v. *Secretary of U. S. Dept. of Transp.*, 260 F. 3d 858, 861 (CA8 2001) (collecting cases).

We cannot approve such a casual disregard of the rules of statutory interpretation.   In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself.  *Schindler Elevator Corp.* v. *United States ex rel. Kirk*, 563 U. S. 401, 407 (2011).   Where, as here, that examination yields a clear answer, judges must stop. *Hughes Aircraft Co.* v. *Jacobson*, 525 U. S. 432, 438 (1999). Even those of us who sometimes consult legislative history will never allow it to be used to "muddy" the meaning of "clear statutory language."   *Milner*, 562 U. S., at 572. Indeed, this Court has repeatedly refused to alter FOIA's plain terms on the strength only of arguments from legislative history.  See, *e.g., Landano*, 508 U. S., at 178 (refusing to expand the plain meaning of Exemption 7(D) based on legislative history); *Weber Aircraft*, 465 U. S., at 800– 803 (refusing to restrict Exemption 5 based on legislative history).

*National Parks*' contrary approach is a relic from a "bygone era of statutory construction."   Brief for United States as *Amicus Curiae* 19.   Not only did *National Parks* inappropriately resort to legislative history before consulting the statute's text and structure, once it did so it went even further astray.   The court relied heavily on statements from witnesses in congressional hearings years earlier on a different bill that was never enacted into law. 498 F. 2d, at 767–769.   Yet we can all agree that "excerpts from committee hearings" are "'among the least illuminating forms of legislative history.'"   *Advocate Health Care Network* v. *Stapleton*, 581 U. S. ___, ___ (2017) (slip op., at 12); see also *Kelly* v. *Robinson*, 479 U. S. 36, 51, n. 13 (1986) (declining to "accord any significance" to "comments in [legislative] hearings").   Perhaps especially so in cases

like this one, where the witness statements do not comport
with official committee reports that are consistent with
the plain and ordinary meaning of the statute's terms.
See S. Rep. No. 813, 89th Cong., 1st Sess., 9 (1965) (Ex-
emption 4 protects information "which would customarily
not be released to the public by the person from whom it
was obtained" such as "business sales statistics" and
"customer lists"); H. R. Rep. No. 1497, 89th Cong., 2d
Sess., 10 (1966) (Exemption 4 exempts material "if it
would not customarily be made public by the person from
whom it was obtained by the Government" and "infor-
mation which is given to an agency in confidence" such as
"business sales statistics").

Unsurprisingly, *National Parks* has drawn considerable
criticism over the years. See, *e.g., Critical Mass Energy
Project* v. *NRC*, 931 F. 2d 939, 947 (CADC 1991) (Ran-
dolph, J., concurring) (*National Parks* was "'fabricated . . .
out of whole cloth'"); *New Hampshire Right to Life* v.
*Department of Health and Human Servs.*, 577 U. S. \_\_\_
(2015) (THOMAS, J., joined by Scalia, J., dissenting from
denial of certiorari). Even the D. C. Circuit has distanced
itself from the decision. While retaining *National Parks*
principally as a matter of *stare decisis* in the context of
information a private entity is *required* to provide to the
government, the court has pointedly declined to extend the
*National Parks* test to information provided *voluntarily* to
the government under Exemption 4. There, the court has
adhered to a much more traditional understanding of the
statutory term "confidential," holding that information
qualifies as confidential "if it is of a kind that would cus-
tomarily not be released to the public by the person from
whom it was obtained." *Critical Mass Energy Project* v.
*NRC*, 975 F. 2d 871, 879–880 (CADC 1992) (en banc); see
also *id.,* at 880–882 (Randolph, J., concurring). Nor, un-
bound by D. C. Circuit precedent, can we discern a per-
suasive reason to afford the *same* statutory term two such

radically different constructions.  *Ratzlaf* v. *United States*, 510 U. S. 135, 143 (1994).

C

   That leaves Argus Leader to try to salvage the result, if not the reasoning, of *National Parks*.  But here its arguments prove no more persuasive.  The company begins by rearranging the text of Exemption 4 to create a phrase that does not appear in the statute: "confidential commercial information."  Then, it suggests this synthetic term mirrors a preexisting common law term of art.  And finally it asserts that the common law term covers only information whose release would lead to substantial competitive harm.  But Argus Leader points to no treatise or case decided before Exemption 4's adoption that assigned any such meaning to the terms actually before us: "commercial or financial information [that is] privileged or confidential."  So even accepting (without granting) that *other* phrases may carry the specialized common law meaning Argus Leader supposes, the parties have mustered no evidence that the terms of Exemption 4 did at the time of their adoption.  Nor will this Court ordinarily imbue statutory terms with a specialized common law meaning when Congress hasn't itself invoked the common law terms of art associated with that meaning.  See, *e.g., Bruesewitz* v. *Wyeth LLC*, 562 U. S. 223, 233–235 (2011).

   Alternatively, the company suggests that, whatever the merits of *National Parks* as an initial matter, Congress effectively ratified its understanding of the term "confidential" by enacting similar phrases in other statutes in the years since that case was decided.  To be sure, the ratification canon can sometimes prove a useful interpretive tool.  But it derives from the notion that Congress is aware of a definitive judicial interpretation of a statute when it reenacts the *same* statute using the same language.  *Helsinn Healthcare S. A.* v. *Teva Pharmaceuticals*

*USA, Inc.*, 586 U. S. ___, ___ (2019) (slip op., at 7). And Congress has never reenacted Exemption 4. So whether Congress's use of similar language in other statutes after *National Parks* might (or might not) tell us what later Congresses understood those other statutes to mean, it tells us nothing about Congress's understanding of the language it enacted in Exemption 4 in 1966.

Finally, Argus urges us to adopt a "substantial competitive harm" requirement as a matter of policy because it believes FOIA exemptions should be narrowly construed. But as we have explained in connection with another federal statute, we normally "have no license to give [statutory] exemption[s] anything but a fair reading." *Encino Motorcars, LLC* v. *Navarro*, 584 U. S. ___, ___ (2018) (slip op., at 9). Nor do we discern a reason to depart from that rule here: FOIA expressly recognizes that "important interests [are] served by [its] exemptions," *FBI* v. *Abramson*, 456 U. S. 615, 630–631 (1982), and "[t]hose exemptions are as much a part of [FOIA's] purpose[s and policies] as the [statute's disclosure] requirement," *Encino Motorcars*, 584 U. S., at ___ (slip op., at 9). So, just as we cannot properly *expand* Exemption 4 beyond what its terms permit, see, *e.g., Milner*, 562 U. S., at 570–571, we cannot arbitrarily *constrict* it either by adding limitations found nowhere in its terms.

Our dissenting colleagues appear to endorse something like this final argument. They seem to agree that the law doesn't demand proof of "substantial" or "competitive" harm, but they think it would be a good idea to require a showing of *some* harm. Neither side, however, has advocated for such an understanding of the statute's terms. And our colleagues' brief brush with the statutory text doesn't help; they cite exclusively from specialized dictionary definitions lifted from the national security classification context that have no bearing on Exemption 4. Really, our colleagues' submission boils down to a policy argument

about the benefits of broad disclosure. But as JUSTICE BREYER has noted, when Congress enacted FOIA it sought a "workable balance" between disclosure and other governmental interests—interests that may include providing private parties with sufficient assurances about the treatment of their proprietary information so they will cooperate in federal programs and supply the government with information vital to its work. See *Milner*, 562 U. S., at 589 (dissenting opinion) (arguing for a broad exemption from FOIA disclosure obligations to honor a "workable balance" between disclosure and privacy).

\*

At least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is "confidential" within the meaning of Exemption 4. Because the store-level SNAP data at issue here is confidential under that construction, the judgment of the court of appeals is reversed and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 18–481

_____

## FOOD MARKETING INSTITUTE, PETITIONER _v._ ARGUS LEADER MEDIA, DBA ARGUS LEADER

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE EIGHTH CIRCUIT

[June 24, 2019]

JUSTICE BREYER, with whom JUSTICE GINSBURG and JUSTICE SOTOMAYOR join, concurring in part and dissenting in part.

The Freedom of Information Act (FOIA) requires the government to make information available to the public upon request. 5 U. S. C. §552(a)(3)(A). It also contains a list of exemptions. §552(b). Exemption 4 says that the Act does "not apply" to "commercial or financial information obtained from a person and . . . confidential." §552(b)(4). The majority holds that "commercial or financial information" is "confidential" and consequently falls within the scope of this exemption "[a]t least" where it is "[1] both customarily and actually treated as private by its owner and [2] provided to the government under an assurance of privacy." _Ante,_ at 11. The majority spells out two conditions, but in my view there is a third: Release of such information must also cause genuine harm to the owner's economic or business interests.

Since 1974, when the District of Columbia Circuit decided _National Parks and Conservation Assn._ v. _Morton_, 498 F. 2d 765, nearly every lower court has imposed some kind of harm requirement. See _New Hampshire Right to Life_ v. _Department of Health and Human Servs._, 577 U. S. \_\_\_, \_\_\_ (2015) (THOMAS, J., dissenting from denial of certiorari) (slip op., at 3) (noting that "every Court of Appeals to

consider Exemption 4 has interpreted it [using] *National Park[s]"*); *Critical Mass Energy Project* v. *NRC*, 975 F. 2d 871, 876 (CADC 1992) (en banc) (collecting cases). One way to satisfy that requirement is by showing that disclosure is "likely" to "cause substantial harm to the competitive position of the person from whom the information was obtained." *National Parks*, 498 F. 2d, at 770, and n. 17. The Eighth Circuit, in this case, applied the same standard. *Argus Leader Media* v. *United States Dept. of Agriculture,* 889 F. 3d 914, 915 (2018). And, like the majority, I believe that *National Parks'* harm requirement goes too far.

For one thing, *National Parks* held that the only form of private harm that can warrant nondisclosure is "*competitive*" harm. 498 F. 2d, at 770–771 (emphasis added). Later courts took this to mean that harm from "future or potential competition" does not suffice, *Niagara Mohawk Power Corp.* v. *Department of Energy*, 169 F. 3d 16, 19 (CADC 1999), and even that harm must "flo[w] from the *affirmative use* of proprietary information *by competitors*," *Public Citizen Health Research Group* v. *FDA*, 704 F. 2d 1280, 1291, n. 30 (CADC 1983) (some emphasis added). But disclosure of confidential information can cause a business serious harm in ways not so directly linked to competition. Disclosure, for example, might discourage customers from using a firm's products, but without substantial effect on its rivals. It could mean increased potential competition, which may, or may not, materialize. It could, by revealing buying habits, undermine a regulated firm that has no competitors. The list goes on. I can discern no basis in the statute for categorically excluding these other types of harm from the scope of Exemption 4.

Similarly, the need to prove "substantial" competitive harm can sometimes produce complex debates about the nature of competition and the degree of injury. *National Parks*, 498 F. 2d, at 770. And those debates can mean

long, onerous court proceedings concerning issues far removed from the genuine fear of harm that leads firms to keep information secret in the first place. The *National Parks* decision itself led to a remand for days of hearings, a second appeal, and yet another remand, so that more evidence about the competitive conditions facing two particular park concessionaires could be heard. *National Parks and Conservation Assn.* v. *Kleppe*, 547 F. 2d 673, 675 (CADC 1976). Like the majority, I can find nothing in FOIA's language, purposes, or history that imposes so stringent a requirement. Accordingly, I would clarify that a private harm need not be "substantial" so long as it is genuine.

On the other hand, I cannot agree with the majority's decision to jump to the opposite conclusion, namely, that Exemption 4 imposes no "harm" requirement whatsoever. After all, the word "confidential" sometimes refers, at least in the national security context, to information the disclosure of which would cause harm. See, *e.g.*, Webster's Third New International Dictionary 476 (1966) (defining "confidential" to mean "characterized by or relating to information considered prejudicial to a country's interests"); Webster's New Collegiate Dictionary 237 (1974) (defining "confidential" to mean "containing information whose unauthorized disclosure could be prejudicial to the national interest"). And a speaker can more sensibly refer to his Social Security number as "confidential" than his favorite color, in part because release of the former is more likely to cause harm. "Confidential," in this sense, conveys something about the nature of the information itself, not just (as the majority suggests) how it is kept by those who possess it.

Reading "confidential" in this more restrictive sense is more faithful to FOIA's purpose and how we have interpreted the Act in the past. This Court has made clear that the "mandate of the FOIA" is "broad disclosure of Gov-

ernment records." *CIA* v. *Sims*, 471 U. S. 159, 166 (1985). Its purpose is to "permit access to official information long shielded unnecessarily from public view" and "to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *EPA* v. *Mink*, 410 U. S. 73, 80 (1973). To that end, we have continuously held that FOIA's enumerated exemptions "must be narrowly construed." *Department of Air Force* v. *Rose*, 425 U. S. 352, 361 (1976); see, *e.g., Milner* v. *Department of Navy*, 562 U. S. 562, 565 (2011) (same); *FBI* v. *Abramson*, 456 U. S. 615, 630 (1982) (noting our "oft-repeated caveat that FOIA exemptions are to be narrowly construed").

The majority's reading of Exemption 4 is at odds with these principles. The whole point of FOIA is to give the public access to information it cannot otherwise obtain. So the fact that private actors have "customarily and actually treated" commercial information as secret, *ante,* at 11, cannot be enough to justify nondisclosure. After all, where information is already publicly available, people do not submit FOIA requests—they use Google. Nor would a statute designed to take from the government the power to unilaterally decide what information the public can view, see *Mink*, 410 U. S., at 80, put such determinative weight on the government's preference for secrecy (what the majority calls the government's "assurance of privacy"), *ante*, at 11.

For the majority, a business holding information as private and submitting it under an assurance of privacy is enough to deprive the public of access. But a tool used to probe the relationship between government and business should not be unavailable whenever government and business wish it so. And given the temptation, common across the private and public sectors, to regard as secret all information that need not be disclosed, I fear the majority's reading will deprive the public of information for

reasons no better than convenience, skittishness, or bureaucratic inertia. The Exemption's focus on "commercial" or "financial" information, for instance, implies that the harm caused by disclosure must do more than, say, simply embarrass the information's owner. It must cause some genuine harm to an owner's economic or business interests.

In sum, the language permits, and the purpose, precedent, and context all suggest, an interpretation that insists upon some showing of harm. And I believe we should say just that. Exemption 4 can be satisfied where, in addition to the conditions set out by the majority, release of commercial or financial information will cause genuine harm to an owner's economic or business interests. (Because it is not at issue, I express no opinion as to whether genuine harm to a *government* interest would suffice.) I would remand the case for a determination as to whether, in this instance, release of the information at issue will cause that genuine harm. To that extent, I dissent from the majority's decision.