# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 20, 2023          Decided June 30, 2023

No. 21-5257

FLYERS RIGHTS EDUCATION FUND, INC., AND PAUL HUDSON,
APPELLANTS

v.

FEDERAL AVIATION ADMINISTRATION,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:19-cv-03749)

———

*Joseph E. Sandler* argued the cause for appellants. With him on the briefs was *Christina E. Bustos*.

*Burt Braverman* was on the brief for *amici curiae* Six Aviation Safety Experts in support of appellants.

*Derek S. Hammond*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief was *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: SRINIVASAN, *Chief Judge*, MILLETT, *Circuit Judge*, and TATEL, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* TATEL.

TATEL, *Senior Circuit Judge*: On October 29, 2018, 189 people boarded a Boeing 737 MAX airplane in Jakarta, Indonesia. A few minutes after takeoff, the plane crashed. No one survived. Five months later, 157 people aboard a 737 MAX in Ethiopia suffered the same fate. The Federal Aviation Administration then grounded the 737 MAX, prompting modifications by Boeing that eventually led the agency to recertify the plane. In this Freedom of Information Act suit, Flyers Rights Education Fund and its president seek documents that the FAA relied upon during the recertification process. Congress exempted from FOIA's reach "commercial or financial information obtained from a person and privileged or confidential," 5 U.S.C. § 552(b)(4), and the district court determined that is precisely what the FAA withheld. For the reasons set forth below, we affirm.

**I.**

Christened in 1967, the Boeing 737 began as "a short, stubby puddle-jumper." Dominic Gates, *Meet the 10,000th 737*, Seattle Times, Mar. 14, 2018, at A1. Over the decades, it evolved into a large, efficient "workhorse" on which millions of passengers fly every day. Ben Mutzabaugh, *Major Milestone for Popular Plane*, USA Today, Mar. 16, 2018, at 4D. The 737 became especially popular with "new 'low-cost carrier' airlines that wanted an efficient, reliable flying machine with fast turnaround times." Gates, *supra*. Boeing has built more than ten thousand 737s, making it "the best-selling jet of all time." *Id.* With the 737 ascendant, Boeing implemented design changes incrementally, "buil[ding] on decades-old systems, many that date back to the original version," instead of "gambl[ing] on developing a brand-new aircraft." Jack Nicas & Julie Creswell, *Boeing's 737 Max: '60s Design Meets '90s Computing Power*, N.Y. Times, Apr. 8, 2019, at A1 (first

quotation); Majority Staff of the House Committee on Transportation & Infrastructure, 116th Cong., *Final Committee Report: The Design, Development & Certification of the Boeing 737 MAX* 40 (Sept. 2020) ("Committee Report") (second quotation).

In 2010, Airbus, "Boeing's chief competitor in the civil airplane market," announced the A320neo, a more fuel-efficient version of its flagship commercial jetliner. Committee Report 38. The "significant cost savings" from this fuel efficiency gave Airbus a "competitive advantage" and threatened the 737's market dominance. *Id.* American Airlines' CEO reportedly called Boeing's CEO to say that "[i]f Boeing wanted [its] business, it would need to move aggressively." David Gelles et al., *A Jet Born of a Frantic Race to Outdo a Rival*, N.Y. Times, Mar. 24, 2019, at A1.

To compete with the A320neo, Boeing developed the 737 MAX, which has more fuel-efficient engines than its predecessor. Committee Report 42. But because those engines are "larger," they "had to be mounted further forward and higher up on the wings in order to maintain sufficient ground clearance." *Id.* "These new characteristics had the potential to cause the aircraft to stall and potentially crash in certain conditions that were more likely to occur given the 737 MAX's new configuration," Amici Curiae Br. 1, particularly during a maneuver called a high-speed, wind-up turn. To counter that tendency, Boeing wrote new software called the Maneuvering Characteristics Augmentation System (MCAS), which was designed to ensure that the plane could be flown safely. FAA, *Summary of the FAA's Review of the Boeing 737 MAX: Return to Service of the Boeing 737 MAX Aircraft* 10 (Nov. 18, 2020) ("FAA Report").

To keep the price of the 737 MAX competitive, Boeing persuaded the FAA that the plane was so similar to its predecessor that pilots who had flown the earlier model could be trained to fly a 737 MAX "in a matter of hours using a computer or tablet." Deferred Prosecution Agreement, *United States v. The Boeing Co.*, No. 4:21-cr-00005-O, Dkt. No. 4, at A-5 (N.D. Tex., Jan. 7, 2021). MCAS required no special training, Boeing assured the FAA, because it "could only activate during a high-speed, wind-up turn." *Id.* at A-8. The truth was quite different. As the company admitted in a deferred prosecution agreement, a Boeing employee realized that MCAS was "running rampant," triggering at speeds that occur during a standard commercial flight. *Id.* at A-10. "[S]o I basically lied to the regulators (unknowingly)." *Id.* But rather than coming clean, Boeing doubled down, reminding the FAA that it had "agreed not to reference MCAS" in the Flight Standardization Board report since "it's outside the normal operating envelope." *Id.* at A-12, A-13. Because of this deception, pilots received no "information about MCAS in their airplane manuals and pilot-training materials." *Id.* at A-14. To make matters worse, MCAS itself had design defects. "[A] single erroneously high . . . sensor input" could trigger MCAS more than once, causing the plane's nose to dip repeatedly. Airworthiness Directives; The Boeing Company Airplanes, 85 Fed. Reg. 74,560, 74,560 (Nov. 20, 2020).

Following a twenty-month review of the two crashes, the FAA determined that most of the contributing "causes and factors" involved MCAS. FAA Report 9. In the meantime, Boeing had fixed MCAS, updating software and hardware, revising manuals, and proposing new pilot training. *Id.* at 8–9. Based on these improvements, in November 2020, the FAA authorized the Boeing 737 MAX to reenter service. *Airworthiness Directives*, 85 Fed. Reg. at 74,560; Operators of Boeing Company Model 737–8 and Boeing Company Model

737–9 Airplanes: Rescission of Emergency Order of Prohibition, 85 Fed. Reg. 74,260 (Nov. 20, 2020).

During the recertification process, FlyersRights filed a FOIA request, followed by this lawsuit, seeking documents that the FAA relied upon in determining whether to unground the 737 MAX. The FAA found more than 100 responsive documents. It released some but withheld or redacted most based on FOIA Exemption 4, which protects "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). The FAA determined that releasing these documents without redaction would disclose "commercial . . . information obtained from" Boeing that is "confidential." *See id.* On cross-motions for summary judgment, the district court sustained the FAA's application of Exemption 4.

FlyersRights appeals. "We review de novo a district court's decision to grant summary judgment," evaluating "whether the agency has sustained its burden of demonstrating that the documents requested are exempt from disclosure." *Perioperative Services & Logistics, LLC v. Department of Veterans Affairs*, 57 F.4th 1061, 1067 (D.C. Cir. 2023) (internal quotation marks and ellipsis omitted).

## II.

FlyersRights challenges the application of Exemption 4 on four grounds. Each lacks merit.

First, FlyersRights disputes the FAA's conclusion that the withheld and redacted information is "confidential." The Supreme Court has observed that "confidential" can be read in at least two senses. "In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it."

*Food Marketing Institute v. Argus Leader Media*, 139 S. Ct. 2356, 2363 (2019). At the threshold, therefore, FlyersRights accepts that under Supreme Court precedent, the information "is customarily kept private" by Boeing. *Id.*

"In another sense," the Supreme Court continued, "information *might* be considered confidential only if the party receiving it provides some assurance that it will remain secret." *Id.* (emphasis added). FlyersRights does not argue that Exemption 4 always requires an assurance of secrecy. Instead, it proposes a more modest corollary: a person loses "'any reasonable expectation'" of confidentiality if it gives documents to the government after receiving "'an explicit representation . . . that its confidential information will be disclosed.'" FlyersRights Reply Br. 6 (quoting FAA Br. 23) (typographical error corrected). The FAA "does not dispute" FlyersRights' proposed standard because "submitting information to the government when the submitter knew or reasonably should have known that the information would be made public is antithetical to 'confidential' treatment." FAA Br. 23–24. The FAA insists, however, that it never told Boeing that it would release these documents.

To demonstrate otherwise, FlyersRights cites four statements by the FAA and two by Boeing. In a characteristic example, the FAA Administrator told a House Committee that "[w]e believe that transparency, open and honest communication, and our willingness to improve our systems and processes are the keys to restoring public trust in the FAA and the safety of the 737 MAX." *The Boeing 737 MAX: Examining the Federal Aviation Administration's Oversight of the Aircraft's Certification*: *Hearing Before the House Committee on Transportation & Infrastructure*, 116th Cong. 14 (2019). FlyersRights argues that the Administrator's statement "could only reasonably be interpreted as meaning

that the FAA would publicly disclose all the essential information needed to evaluate and assess its ungrounding decision," including every document at issue here. FlyersRights Br. 23. We disagree. The FAA's broad promises of "transparency" and "open and honest communication" fall far short of an "'*explicit* representation'" (FlyersRights' own words) that the FAA would disclose the disputed documents. FlyersRights Reply Br. 6 (quoting FAA Br. 23) (emphasis added). Moreover, Boeing contends that disclosure would "undermine [its] competitive position by allowing competitors access to ideas, design details, certification methods, and testing processes." Allen Decl. ¶ 19, Joint Appendix ("J.A.") 59; *see* FAA Br. 22 n.1 (agreeing that disclosure would "harm . . . Boeing's competitive position"). According to Boeing, therefore, disclosure would run afoul of FAA policy that the agency "must <u>not</u> release proprietary information (descriptive, design, and substantiating data received from applicants)" without "written permission from the applicant." FAA, Order 8110.4C, *Type Certification* (Mar. 28, 2007). Given this context, no reasonable factfinder could conclude that the FAA's generic promises of transparency placed Boeing on notice that the FAA would release these documents. *Cf. Washington Post Co. v. Department of Health & Human Services*, 865 F.2d 320, 326 (D.C. Cir. 1989) (applying "no reasonable factfinder" standard in Exemption 4 case at summary-judgment stage), *abrogated in part on other grounds*, *Food Marketing Institute*, 139 S. Ct. at 2356.

The Boeing CEO's statements are only slightly more specific. He said in interviews that Boeing "will be transparent on every subject, whether it is training, whether it's the certification process, everything along the way," and that "[w]e're going to have the most open book the world has ever seen on this subject." Plaintiffs' Statement of Material Facts as to Which There Is No Genuine Issue ¶¶ 30–31; Defendant's

Response ¶¶ 30–31. These statements hardly amount to an "explicit" commitment to release these particular proprietary documents, let alone an indication that the FAA would do so. FlyersRights Reply Br. 6 (quoting FAA Br. 23).

FlyersRights next challenges the FAA's decision to withhold or redact four documents containing the FAA's own comments. Exemption 4 protects only information "obtained from a person," 5 U.S.C. § 552(b)(4), and that "person" must be "outside the government." *See Gulf & Western Industries, Inc. v. United States*, 615 F.2d 527, 529 (D.C. Cir. 1979). As FlyersRights observes, the FAA did not "obtain from" Boeing the comments that the FAA itself authored. But as we explained in *Gulf & Western*, Exemption 4 protects information third parties provide even when the government incorporates that information into its own documents. There, we upheld the redaction of an agency-authored report because releasing it without redactions "would disclose data supplied to the government from a person outside the government." *Id.* at 530. The same is true here. FAA declarant Susan Cabler avers that "[a]lthough [Boeing's] information is incorporated into FAA-authored comments, these comments nonetheless reveal proprietary information originally provided to [the] FAA by Boeing." Cabler Decl. ¶ 51, J.A. 244. Just as the agency in *Gulf & Western* permissibly redacted its own report, the FAA permissibly redacted its own comments to avoid disclosing confidential commercial information obtained from Boeing.

Citing a pair of district court opinions, FlyersRights urges us to hold that Exemption 4 protects agency-authored materials only where they contain third-party information "repeated verbatim," "slightly modified," or "summarize[d]," not where, as FlyersRights says happened here, the agency "analyzes" or "substantially reformulate[s]" the information. *See Naumes v. Department of the Army*, 588 F. Supp. 3d 23, 38 (D.D.C. 2022)

(third and fourth quotations); *Southern Alliance for Clean Energy v. Department of Energy*, 853 F. Supp. 2d 60, 68 (D.D.C. 2012) (other quotations). But these standards appear nowhere in the statute. To be sure, sometimes an agency's analysis or reformulation of confidential commercial information can be disclosed without revealing the underlying information, rendering Exemption 4 inapplicable. And it is important that the agency sufficiently explain why information that it generates cannot be released. Here, however, the FAA has demonstrated that releasing its comments unredacted would reveal confidential commercial information obtained from Boeing, so Exemption 4 applies.

Next, FlyersRights argues that the FAA must disclose the documents Boeing submitted to show compliance with FAA regulations because those means-of-compliance documents form "part of the binding law of the agency." FlyersRights Reply Br. 22. As we have explained, "an agency is not permitted to develop 'a body of secret law, used by it in the discharge of its regulatory duties.'" *Electronic Frontier Foundation v. DOJ*, 739 F.3d 1, 7 (D.C. Cir. 2014) (quoting *Schlefer v. United States*, 702 F.2d 233, 244 (D.C. Cir. 1983) (some internal quotation marks omitted)). But no court has yet applied this secret-law doctrine to limit the scope of Exemption 4. We need not consider whether that doctrine applies here because Boeing's private means of compliance form no part of the FAA's body of law, secret or otherwise.

True, the "FAA and some standards organizations publish means of compliance that have already been accepted," and "applicants can choose to use these publicly available methods to show compliance with FAA's certification regulations." Cabler Decl. ¶ 29, J.A. 235. *See, e.g.*, Accepted Means of Compliance; Airworthiness Standards; Normal Category Airplanes, 87 Fed. Reg. 13,911 (Mar. 11, 2022). Here,

however, Boeing developed proprietary means of compliance "specifically related to its 737 MAX aircraft," Cabler Decl. ¶ 29, J.A. 236, and FlyersRights identifies no regulation requiring the FAA to allow Boeing, or anyone else, to use these *sui generis* means of compliance for any other aircraft. Accordingly, Boeing's means of compliance do not "'bind[] . . . the public,'" "'create or determine the extent of the substantive rights and liabilities of a person,'" or "speak authoritatively on the [agency's] policy." *See Afshar v. Department of State*, 702 F.2d 1125, 1143, 1141 (D.C. Cir. 1983) (quoting *Cuneo v. Schlesinger*, 484 F.2d 1086, 1090 (D.C. Cir. 1973) and *Federal Open Market Committee of the Federal Reserve System v. Merrill*, 443 U.S. 340, 352 (1979)) (first two quotations); *Electronic Frontier Foundation*, 739 F.3d at 9 (third quotation). In short, they are not law.

Finally, FlyersRights argues that the FAA failed to disclose responsive information that can be segregated from Boeing's confidential commercial information. When an agency demonstrates that records contain exempt information, as the FAA has done, it is "entitled to a presumption that [it] complied with the obligation to disclose reasonably segregable material." *Sussman v. United States Marshals Service*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). To "rebut[] this presumption," the requester must offer, at least, "evidence that would warrant a belief by a reasonable person" that the agency failed to comply with its obligation. *Id.* (internal quotation marks and citation omitted). FlyersRights has offered no such evidence, claiming only that "it is apparent that the agency has not shown that it would be unable reasonably to segregate the information Appellants seek from Boeing's proprietary technical information." FlyersRights Br. 38–39. Such unsubstantiated assertions fail to rebut the presumption. *See Sussman*, 494 F.3d at 1117 (rebutting presumption requires some "quantum of evidence"). FlyersRights' focus on

"proprietary technical information" moves the goalposts. Exemption 4 protects confidential commercial information, not just proprietary technical information.

Even without the presumption, the FAA introduced evidence sufficient to carry its burden on segregability. The *Vaughn* index describes each document, and the Cabler Declaration explains that "the withheld documents consist almost entirely of Boeing's proprietary technical data" and its "proprietary methods of compliance." Cabler Decl. ¶ 67, J.A. 249. Further tailoring the redactions, Cabler adds, "would result in disclosure of only partial sentences or single sentences that are entirely meaningless without the additional context of the surrounding proprietary information." *Id.* ¶ 67, J.A. 250. On top of that, the record contains a Boeing paralegal's declaration explaining that the company's confidential information "comprise[s] almost the entirety of" the documents and that even things "which in many documents would be considered ancillary and releasable," like tables of contents, "present[] a roadmap to the methods, logic, and techniques that Boeing uses to demonstrate compliance and obtain certification." Allen Decl. ¶ 23, J.A. 60. The FAA independently evaluated Boeing's objections and withheld or redacted material only where the agency agreed that Exemption 4 applies. Cabler Decl. ¶ 45, J.A. 242 ("The Aircraft Certification Service's FOIA coordinator and subject matter experts determined that the vast majority of Boeing's objections were valid; however, in circumstances where the Aircraft Certification Service disagreed with these objections, . . . Boeing agreed to withdraw the disputed objections, and the material was released to FlyersRights.").

FlyersRights relies on *Stolt-Nielsen Transportation Group v. United States*, where our court held that the government failed to demonstrate that it released all reasonably

segregable material because it offered only "a conclusory affidavit." 534 F.3d 728, 734 (D.C. Cir. 2008). As explained above, however, the FAA's declarations are not at all conclusory. *See, e.g.*, *Porup v. CIA*, 997 F.3d 1224, 1239 (D.C. Cir. 2021) ("Ms. Shiner attested that the Agency had 'conducted a page-by-page and line-by-line review, and released all reasonably segregable, non-exempt information' within responsive records. Moreover, Ms. Shiner 'determined that no additional information may be released without divulging information that . . . falls within the scope of one or more FOIA exemptions.' Those sworn statements sufficiently establish that no portions of the withheld documents may be segregated and released.") (some internal quotation marks and citations omitted).

At oral argument, we and the parties focused on two documents containing FAA comments, which the agency withheld in their entirety. When an agency incorporates exempt information into its own comments, it will often be able to release at least part of those comments without revealing the exempt information. Here, however, the FAA explained that these documents "contained FAA comments to Boeing's project deliverables, which in themselves would reveal technical data and Boeing's proprietary methods of compliance." Cabler Decl. ¶ 51, J.A. 244. Notably, the FAA released two other documents containing its comments in redacted form. That fact, coupled with the FAA's nonconclusory affidavits and *Vaughn* index, demonstrates that it understands the difference between comments that reveal Boeing's confidential information and comments that do not. Accordingly, even as to these two withheld documents, the FAA has demonstrated that it complied with its segregability obligations.

### III.

For the foregoing reasons, we affirm.

*So ordered.*