# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Keystone Nursing and Rehab of      :
Reading, LLC, Keystone Nursing and   :
Rehab of Lancaster, LLC, Phoenixville  :
Care, LLC, Rosemont Care, LLC,      :
Stenton Care, LLC, Harborview       :
Rehabilitation and Care Center at     :
Doylestown, LLC, Harborview        :
Rehabilitation and Care Center at     :
Lansdale, LLC, The Meadows at       :
Harrisburg for Nursing and         :
Rehabilitation, LLC, The Meadows at   :
Camp Hill for Nursing and         :
Rehabilitation, LLC, The Meadows    :
at East Mountain-Barr for Nursing    :
and Rehabilitation, LLC, The Meadows :
at Gettysburg for Nursing and       :
Rehabilitation, LLC, The Meadows at   :
Pottsville for Nursing and         :
Rehabilitation, LLC, The Meadows at   :
Sunbury for Nursing and Rehabilitation, :
LLC, The Meadows at Scranton for    :
Nursing and Rehabilitation, LLC,     :
The Meadows at Stroud for Nursing and :
Rehabilitation, LLC, The Meadows at   :
Summit for Nursing and Rehabilitation, :
LLC, The Meadows at Tunkhannock    :
For Nursing and Rehabilitation, LLC,  :
and The Meadows at West Shore for    :
Nursing and Rehabilitation, LLC,     :
                   Petitioners   :
                           :

            v.            :   No. 1631 C.D. 2018
                           :

Daniel Simmons-Ritchie and PA Media :
Group,                         :
                   Respondents  :


Golden Living,               :
                   Petitioner   :

|                                                              |   |                          |
|--------------------------------------------------------------|---|--------------------------|
|                                                              | : |                          |
| v.                                                           | : | No. 1692 C.D. 2018       |
|                                                              | : |                          |
| Daniel Simmons-Ritchie and The PA<br>Media Group,            | : |                          |
|                                            Respondents       | : |                          |

|                                                              |   |                          |
|--------------------------------------------------------------|---|--------------------------|
| Monroeville Operations, LLC,                                 | : |                          |
| Mt. Lebanon Operations, LLC,                                 | : |                          |
| Murrysville Operations, LLC, and                             | : |                          |
| South Hills Operations, LLC,                                 | : |                          |
|                                            Petitioners       | : |                          |
|                                                              | : |                          |
| v.                                                           | : | No. 1696 C.D. 2018       |
|                                                              | : | Argued:  September 10, 2019 |
| Daniel Simmons-Ritchie and                                   | : |                          |
| PA Media Group,                                              | : |                          |
|                                            Respondents       | : |                          |

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                   HONORABLE PATRICIA A. McCULLOUGH, Judge
                   HONORABLE CHRISTINE FIZZANO CANNON, Judge


**OPINION NOT REPORTED**


**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**                         **FILED:  January 3, 2020**

The above-captioned Petitioners petition for review[1] of a Final Determination of the Pennsylvania Office of Open Records (OOR) dated December 3, 2018, which denied in part and granted in part a Right-To-Know Law[2] (RTKL) request (Request) filed by Daniel Simmons-Ritchie of the PA Media Group (collectively, Requesters)

---

[1] These matters were consolidated by order of this Court dated February 22, 2019.
[2] Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101-67.3104.

with the Pennsylvania Department of Health (Department) pertaining to the transfer of ownership of 35 long-term care facilities (Facilities) in Pennsylvania. Petitioners generally request this Court to reverse the Final Determination in part and conclude that the records in question are exempt from disclosure under the RTKL as confidential proprietary information and trade secrets. Petitioners also request this Court to conclude that part of the Request is not sufficiently specific and, as such, responsive records to that part need not be provided by Department. Upon review, we affirm in part and reverse in part.

## I. Factual Background and Procedure

### A. *The Request and Department's Response*

On May 18, 2018, Requesters filed the Request with Department to obtain documents related to the transfer of ownership of the Facilities from Golden Living operators to other entities, including Petitioners. Specifically, in relevant part, the Request sought the following:

1) A copy of all correspondence by and between the Department and the Facility (and/or the Facility's owners, agents, and/or attorneys), including all attachments thereto, pertaining to changes in ownership for 35 nursing homes . . . between January 1, 2016 to present.

2) A copy of all agreements and contracts (including but not limited to management agreements, operations transfer agreements, lease agreements, administrative services agreements, settlement agreements, and other contracts of any kind) supplied to the Department by the Facility (and/or the Facility's owners, agents, and/or attorneys), including all attachments thereto, pertaining to changes in ownership for 35 nursing homes . . . between January 1, 2016 to present.

. . .

3

4) A copy of all correspondence sent and received (including text messages and written memos) by Acting Department Secretary Dr. Rachel Levine, Communications Director April Hutcheson, Press Secretary Nate Wardle, and Nursing Home Division Director Susan Williamson, between April 1, 2018 to present [(May 18, 2018)].[3]

(Reproduced Record (R.R.) at 519a.) After obtaining additional time to respond, Department issued a final response to the Request on July 10, 2018, granting the Request in part and denying it in part. Department provided some records in response to Items 1 and 2 of the Request; however, it redacted information in the disclosed records, including: "individual home addresses, phone numbers, fax numbers, bank account numbers, and email addresses." (*Id.* at 528a.) Department also withheld some records pertaining to Items 1 and 2 of the Request as exempt, either as records Department deemed to be predecisional or records that the Facilities deemed to contain trade secrets or confidential proprietary information (Withheld Records). (*Id.*) Department denied Item 4 of the Request as not being sufficiently specific for it to identify the records being requested. (*Id.*)

### B. *Appeal to the 66*

On July 31, 2018, Requesters appealed Department's final response with respect to Items 1, 2, and 4, using the OOR's standard electronic appeal form. (R.R. at 7a-8a.) Requesters attached to the appeal form a written submission setting forth their specific reasons for appealing Department's final response. As to Items 1 and 2, Requesters argued that the Withheld Records "are public and should be provided" and that "[t]he OOR has previously granted access to correspondence regarding changes of nursing home ownership." (*Id.* at 5a.) As to Item 4, Requesters argued

---

[3] The Request sought three additional items, which are not at issue in the present matter; therefore, discussion of the additional items has been omitted.

that "[b]ecause [the] [R]equest included a limited time frame (April 1 to May 18) and only encompassed a limited number of parties (4 employees) . . . this request is sufficiently specific." (*Id.* at 6a.) Lastly, Requesters asserted that Department should provide an exemption log of all documents it withheld.[4] Thereafter, on August 6, 2018, Requesters submitted an amended appeal letter, which made substantially the same arguments as the July 31, 2018 appeal letter, but contained additional citations.

Keystone Nursing and Rehab of Reading, LLC and 17 other Petitioners (collectively, Consolidated Providers[5]) submitted requests to participate[6] in the appeal before the OOR, as did Monroeville Operations, LLC and 3 other Petitioners

---

[4] Requesters' appeal to the OOR makes additional arguments concerning issues not before us on appeal; therefore, those arguments have been omitted.

[5] Consolidated Providers are: Keystone Nursing and Rehab of Reading, LLC; Keystone Nursing and Rehab of Lancaster, LLC; Phoenixville Care, LLC; Rosemont Care, LLC; Stenton Care, LLC; Harborview Rehabilitation and Care Center at Doylestown, LLC; Harborview Rehabilitation and Care Center at Lansdale, LLC; The Meadows at Harrisburg for Nursing and Rehabilitation, LLC; The Meadows at Camp Hill for Nursing and Rehabilitation, LLC; The Meadows at East Mountain-Barr for Nursing and Rehabilitation, LLC; The Meadows at Gettysburg for Nursing and Rehabilitation, LLC; The Meadows at Pottsville for Nursing and Rehabilitation, LLC; The Meadows at Sunbury for Nursing and Rehabilitation, LLC; The Meadows at Scranton for Nursing and Rehabilitation, LLC; The Meadows at Stroud for Nursing and Rehabilitation, LLC; The Meadows at Summit for Nursing and Rehabilitation, LLC; The Meadows at Tunkhannock for Nursing and Rehabilitation, LLC; and The Meadows at West Shore for Nursing and Rehabilitation, LLC.

[6] Pursuant to Section 1101(c)(1) of the RTKL:

A person other than the agency or requester with a direct interest in the record subject to an appeal under this section may, within 15 days following receipt of actual knowledge of the appeal but no later than the date the appeals officer issues an order, file a written request to provide information or to appear before the appeals officer or to file information in support of the requester's or agency's position.

65 P.S. § 67.1101(c)(1).

(collectively, Operations Providers[7]), and Golden Living, which OOR granted after receiving no objections.

Having been granted status as direct interest participants, Petitioners filed position papers and submitted multiple affidavits and attestations in support of their arguments. Department also filed a position paper reaffirming its reasons for granting and denying the Request in part. Requesters responded, reiterating their position that the Withheld Records are public records subject to disclosure. With respect to Item 4, Requesters asserted that their "request has not changed'" and that they "seek all responsive records" with respect to Item 4 "regardless of whether those records do or do not relate to 'nursing home lease information.'" (R.R. at 79a.)

On August 31, 2018, an appeals officer at OOR presented two preliminary questions to the parties. First, the appeals officer asked Requesters whether they were "appealing the Department's redaction of personal information" from the disclosed records. (*Id.* at 501a.) Second, the appeals officer asked Department to clarify "how many withheld or redacted records are at issue" and for "Department [to] give [] an estimate of how much time it would take to produce" exemption logs detailing the make-up of the Withheld Records. (*Id.*) With respect to the redactions, Requesters responded by stating that it was their belief that "the [D]epartment's redactions were reasonable and consistent with the RTKL's exemption regarding personally identifying information." (*Id.* at 503a.) With respect to the exemption logs, after agreement by the parties, the appeals officer asked Department to create exemption logs for four of the Facilities (Exemption Logs) to determine "whether an *in camera* review is necessary." (*Id.* at 502a.) Department produced the

---

[7] Operations Providers are: Monroeville Operations, LLC; Mt. Lebanon Operations, LLC; Murrysville Operations, LLC; and South Hills Operations, LLC.

6

Exemption Logs[8] on September 18, 2018. (*Id.* at 509a-15a.) After review of the Exemption Logs, the OOR determined that "a full *in camera* review of all records" was not necessary. (Consolidated Providers, Certified Record (C.R.) Item 32; Operations Providers, C.R. Item 32; Golden Living, C.R. Item 32.)

*C. The OOR's Final Determination*

Based upon the parties' position papers, and after receiving several extensions, the OOR issued its Final Determination on December 3, 2018, which granted Requesters' appeal in part and denied it in part. The OOR, in relevant part, made the following findings:

(1) The Appeal is sufficient under Section 1101(a) of the RTKL.

Requesters' appeal met the requirements set forth in Section 1101(a)(1) of the RTKL. Section 1101(a)(1) provides that on appeal, a request must "state the grounds upon which the requester asserts that the record is a public record . . . and . . . address any grounds stated by the agency for delaying or denying the request." 65 P.S. § 67.1101(a)(1). The OOR concluded Requesters satisfied the first part of Section 1101(a)(1) by submitting the OOR's standard electronic appeal form, which states "the records do not qualify for any exemptions under [Section] 708 of the RTKL, are not protected by a privilege, and are not exempt under any Federal or State law or regulation." (Final Determination at 12 (citation omitted).) The OOR further concluded Requesters satisfied the second part of Section 1101(a)(1) by "attach[ing]

_____

[8] The OOR found that the Exemption Logs generally show that the following records were withheld from disclosure: "lists of facilities owned or operated by identified operators, operating agreements, master leases, responses to Department questions, personal resumes, governance information, operation transfer agreements, secondary agreements pursuant to the ownership transfer, and structuring information." (Final Determination at 10.)

7

a written rationale to [the] appeal identifying each exemption invoked by the Department, [and] asserted [their] belief that the exemptions do not apply." (*Id.* at 12.) Thus, the OOR found Requesters' appeal "sufficient under Section 1101(a) of the RTKL." (*Id.* at 13.)

### (2) Item 4 is sufficiently specific.

The OOR found that Item 4[9] is sufficiently specific under Section 703 of the RTKL, which provides, in relevant part, that "[a] written request should identify or describe the records sought with sufficient specificity to enable the agency to ascertain which records are being requested." 65 P.S. § 67.703. The OOR used the three-part test set forth in *Department of Education v. Pittsburgh Post-Gazette*, 119 A.3d 1121 (Pa. Cmwlth. 2015), to determine whether the Request was sufficiently specific. The test requires examining whether the Request sets forth: "(1) the subject matter of the request; (2) the scope of documents sought; and (3) the timeframe for which records are sought." *Id.* at 1124. Citing *Easton Area School District v. Baxter*, 35 A.3d 1259, 1265 (Pa. Cmwlth. 2012), the OOR concluded that while Item 4 lacks a subject matter, it is limited in scope and time; therefore, Item 4 was sufficiently specific under Section 703. (Final Determination at 16.)

### (3) Certain third-party records are exempt under Section 708(b)(11).

Based upon the Exemption Logs, the OOR determined that the Withheld Records are comprised of five categories of records: (1) master leases; (2) resumes

---

[9] In its Final Determination, the OOR refers to this item as Item 3, presumably because only three of the items in the Request were at issue before it. However, because the parties refer to this as Item 4 and because it is Item 4 in the Request, we will refer to this as Item 4.

of the third-party applicants or managers; (3) business plans; (4) operations documents; and (5) responses to Department's "Ten Questions.[10]" The OOR found that certain categories of records were exempt from disclosure under Section 708(b)(11) of the RTKL, 65 P.S. § 67.708(b)(11), as trade secrets or confidential proprietary information. In determining whether the records were kept confidential for purposes of the confidential proprietary information exemption, the OOR considered "the efforts the parties undertook to maintain their secrecy." *Dep't of Pub. Welfare v. Eiseman*, 85 A.3d 1117, 1128 (Pa. Cmwlth. 2014), *rev'd on other grounds,* 125 A.3d 19 (Pa. 2015). The OOR noted that:

> Several of the parties have argued that the OOR improperly reads efforts undertaken to maintain secrecy into the definition of "confidential" when evidence of such efforts is only a requirement to demonstrate trade secrets and have urged the OOR to adopt a parallel construction to federal FOIA [(Freedom of Information Act, 5 U.S.C. § 552)] cases here. The OOR understands these arguments, but the test suggested by the parties is contrary to the test articulated by the Commonwealth Court in *Eiseman*, which explicitly related to the definition of confidential proprietary information. This part of the holding in *Eiseman* was not questioned by the Pennsylvania Supreme Court in its partial reversal.

(Final Determination at 21 n.8 (citations omitted).)

The OOR found Golden Living did not meet its burden of demonstrating that disclosure of the Withheld Records would result in substantial competitive injury. Thus, the OOR concluded "that the attestation submitted by Golden Living is not sufficient to demonstrate that the records are exempt from disclosure under Section

---

[10] Department requests "[h]ealth [c]are [p]roviders [a]pplying [f]or [a] [l]icense [t]o [o]perate [a] [h]ealth [c]are [f]acility" provide responses to 10 questions, including subparts, relating to business structure, including ownership and management information; headquarters location; health care services to be provided; previous experience in operating health care facilities; and intentions with respect to charity care. (R.R. at 551a-53a.)

9

708(b)(11)." (Final Determination at 27.) With respect to the Consolidated Providers, the OOR found that:

> [T]he evidence submitted by the Consolidated Providers is sufficient to demonstrate that the business plans and operations information are confidential and proprietary under Section 708(b)(11). The Consolidated Providers, however, have not provided any evidence that the leases sought contain any information exempt under Section 708(b)(11), and therefore those leases[11] must be provided without redaction. Similarly, the Consolidated Providers have not demonstrated that release of the ownership or biographical information submitted to the Department is confidential or likely to create competitive harm.

(*Id.* at 30 (footnote omitted).) With respect to the Operations Providers, the OOR found that:

> [T]he evidence submitted by the Operations Providers is sufficient to demonstrate that the business plans and operations information are confidential and proprietary under Section 708(b)(11). Again, however, the OOR is unable to find that the Operations Providers have demonstrated that disclosure of the master leases, ownership information or employee biographical information is likely to create significant competitive harm for the Operations Providers.

(*Id.* at 31.)

Also before the OOR, but not before us, as a direct interest participant was Guardian Elder Care (Guardian). The OOR concluded that Guardian met its burden of demonstrating that its answer to the first question of Department's "Ten

---

[11] We note that the OOR found that the following seven Petitioners demonstrated that no lease agreements exist for their facilities and, therefore, obviously cannot be disclosed since they do not exist: (1) Keystone Nursing and Rehab of Reading, LLC; (2) Keystone Nursing and Rehab of Lancaster, LLC; (3) Phoenixville Care, LLC; (4) Rosemont Care, LLC; (5) Stenton Care, LLC; (6) Harborview Rehabilitation and Care Center at Doylestown, LLC; and (7) Harborview Rehabilitation and Care Center at Lansdale, LLC. (Final Determination at 17.)

Questions" was exempt from disclosure, as well as its business plan, operations documents, and minimum coverage ratios set forth in its lease agreements. (Final Determination at 25.)

In summary, the OOR found that the business plans and operations information of the Consolidated Providers and Operations Providers (collectively, Providers) are exempt as confidential proprietary information. However, the OOR ordered the disclosure of the master leases, biographical information, and ownership information of all Petitioners, and the entirety of the Withheld Records with respect to Golden Living (collectively, Disputed Records).

## II. Discussion

On appeal,[12] Petitioners collectively[13] present the following seven issues[14] for review: (1) whether Requesters' appeal to the OOR complies with the requirements set forth in Section 1101(a)(1) of the RTKL; (2) whether there is sufficient evidence of record to support finding that the Disputed Records are exempt from disclosure as confidential proprietary information; (3) whether our precedent in *Eiseman* should be reexamined and overturned; (4) whether this Court should remand this matter to the OOR to determine whether the Disputed Records, including the leases, ownership information, or biographical information, contain trade secrets; (5) whether the OOR erred by ordering the release of records without ordering redactions of those records to protect personal privacy rights; (6) whether Item 4 of

---

[12] "On appeal from the OOR in a [RTKL] case, this Court's standard of review is de novo, and our scope of review is plenary." *Saunders v. Dep't of Corr.*, 172 A.3d 110, 111 n.2 (Pa. Cmwlth. 2017).

[13] Pursuant to Pennsylvania Rule of Appellate Procedure 2137, Pa.R.A.P 2137, Golden Living and Operations Providers adopted, in their entirety, the arguments made by Consolidated Providers as set forth in Consolidated Providers' brief. Both also filed their own briefs.

[14] We have rearranged the order of Petitioners' arguments for ease of discussion.

the Request is sufficiently specific under the RTKL; and (7) whether this Court should remand this matter for an *in camera* review of the responsive records pertaining to Item 4 to determine whether the responsive records contain information which is exempt from disclosure.

Preliminarily, before reaching the merits of the parties' arguments, we note that "the objective of the [RTKL] . . . is to empower citizens by affording them access to information concerning the activities of their government." *SWB Yankees LLC v. Wintermantel*, 45 A.3d 1029, 1042 (Pa. 2012.) We must "liberally construe the RTKL to effectuate its purpose of promoting 'access to official government information in order to prohibit secrets, scrutinize actions of public officials, and make public officials accountable for their actions.'" *Levy v. Senate of Pennsylvania*, 65 A.3d 361, 381 (Pa. 2013) (quoting *Allegheny County Dep't of Admin Servs. v. A Second Chance, Inc.*, 13 A.3d 1025, 1034 (Pa. Cmwlth. 2011)). "Consistent with the RTKL's goal of promoting government transparency and its remedial nature, the exceptions to disclosure of public records must be narrowly construed." *Bagwell v. Dep't of Educ.*, 114 A.3d 1113, 1122 (Pa. Cmwlth. 2015). We now turn to the merits of the parties' arguments.

### A. Whether Requesters' appeal to the OOR complies with the requirements set forth in Section 1101(a)(1).

Golden Living asserts that Requesters' appeal to the OOR is not sufficient under Section 1101(a)(1) of the RTKL because Requesters did not explain why they believed the requested records are public records. Specifically, Golden Living argues that Requesters, in their appeal to the OOR, "identified the exemptions claimed by the D[epartment] and then claimed that [they] did not believe those exemptions applied," but that this assertion "hardly satisfies the [R]equesters[']

obligation to 'specify . . . particular defects' with the D[epartment's] decision." (Golden Living's Brief (Br.) at 12 (fifth alteration in the original) (emphasis omitted).) Requesters respond by arguing that their "appeal to the OOR consisted of three pages of detailed explanation including a summary of interactions, the specific items which the Requester[s] wished to appeal, a summary of each and the response of the D[epartment] to each, and why the Requester[s] believed that the withheld documents were public records." (Requesters' Br. at 46.) Therefore, Requesters argue they satisfied the requirements set forth in Section 1101(a)(1).

As stated above, pursuant to Section 1101(a)(1) of the RTKL, a requester appealing to the OOR must "state the grounds upon which the requester asserts that the [requested] record is a public record . . . and shall address any grounds stated by the agency for delaying or denying the request." 65 P.S. § 67.1101(a)(1). To satisfy the requirements set forth in Section 1101(a)(1), a requester must "state why the [requested] records d[o] not fall under the asserted exemptions and, thus, [a]re public records subject to access." *Saunders v. Dep't of Corr.*, 48 A.3d 540, 543 (Pa. Cmwlth. 2012). Section 1101(a)(1) does not require "a requester to prove anything;" rather, Section 1101(a)(1) "merely places a burden on a requester to identify flaws in an agency's decision denying a request." *Dep't of Corr. v. Office of Open Records*, 18 A.3d 429, 434 (Pa. Cmwlth. 2011) (emphasis omitted). Failure to comply with Section 1101(a)(1) renders the appeal deficient. *See Barnett v. Dep't of Pub. Welfare*, 71 A.3d 399, 405-06 (Pa. Cmwlth. 2013); *see also Padgett v. Pa. State Police*, 73 A.3d 644, 647 (Pa. Cmwlth. 2013) ("[A] minimally sufficient appeal is a condition precedent for [the] OOR to consider a requester's challenge to an agency denial.").

13

Here, Requesters filed the OOR's standard electronic appeals form, which states "the records do not qualify for any exemptions under [Section] 708 of the RTKL, are not protected by a privilege, and are not exempt under any Federal or State law or regulation." (R.R. at 8a.) Attached to Requesters' appeal to the OOR was a three-page written submission identifying each rationale asserted by Department for denying the Request in part and explaining Requesters' rationale for believing that the Withheld Records are public records that do not fall within the asserted exemptions.

The standard electronic appeals form, coupled with Requesters' written submission, satisfy the requirements set forth in Section 1101(a)(1). In these submissions, Requesters asserted that the Withheld Records are not exempt from disclosure and set forth their rationale for believing that the asserted exemptions do not apply. Accordingly, we affirm the OOR's finding that Requesters satisfied the requirements of Section 1101(a)(1) because Requesters identified what they believe to be "flaws in an agency's decision denying a request." *Dep't of Corr.*, 18 A.3d at 434.

### B. Whether there is sufficient evidence of record to support finding that the Disputed Records are exempt from disclosure as confidential proprietary information.

Petitioners argue that the OOR erred by not finding that all of the Withheld Records, including the Disputed Records, were exempt from disclosure under the RTKL. Petitioners, citing the attestations and affidavits they submitted, assert that they submitted sufficient evidence to find that all of the Withheld Records are exempt from disclosure under the RTKL as confidential proprietary information and that the OOR erred in finding that some, but not all, of the Withheld Records were exempt. With respect to the leases specifically, Petitioners argue that disclosure of

14

their leases would allow competitors to gain insight into Petitioners' business model, which they contend violates the OOR's decision in *Colgate-Palmolive Company v. Pennsylvania Insurance Department* (OOR, Dkt. No. AP 2013-1631, filed March 7, 2014). Petitioners also argue that the OOR erred by finding that Guardian's lease agreements were exempt, but not Petitioners' leases, when the sworn verification submitted by Guardian was substantially similar to the affidavits and attestations provided by Petitioners.

Requesters argue that Petitioners have not met their burden of demonstrating that the Disputed Records are exempt from disclosure as confidential proprietary information. Requesters contend that the affidavits and attestations provided by Petitioners are conclusory and that, while the affidavits and attestations "track the language of the exemption, . . . merely stating that the test has been met without providing sufficiently detailed evidence and examples of how and why the test is met is not sufficient." (Requesters' Br. at 20.) Specifically, Requesters aver that Petitioners have failed to provide evidence "which would lend credence to the fact that Petitioners would likely suffer" competitive harm if the Disputed Records were released. (*Id.*)

Pursuant to Section 305(a) of the RTKL, "[a] record in the possession of a Commonwealth agency or local agency shall be presumed to be a public record." 65 P.S. § 67.305(a). However, certain information, including confidential proprietary information and trade secrets, are exempt from disclosure under the RTKL. *Id*; 65 P.S. § 67.708(b)(11). "The party asserting an exemption bears the burden of proving the exemption applies" by a preponderance of the evidence.[15] *Highmark Inc. v.*

---

[15] "A preponderance of the evidence is such evidence as would lead a fact-finder to find that the existence of a contested fact is more probable than the nonexistence of the contested fact." *Office of the Dist. Atty. of Phila. v. Bagwell*, 155 A.3d 1119, 1130 (Pa. Cmwlth. 2017).

*Voltz*, 163 A.3d 485, 490 (Pa. Cmwlth. 2017). The term "[c]onfidential proprietary information" is defined by Section 102 of the RTKL as:

Commercial or financial information received by an agency:

(1) which is privileged or confidential; and
(2) the disclosure of which would cause substantial harm to the competitive position of the person that submitted the information.

65 P.S. § 67.102. When determining whether records are "confidential," we must look to "the efforts the parties undertook to maintain their secrecy." *Eiseman*, 85 A.3d at 1128.[16] This test is referred to by the OOR and the parties as the "efforts test." "In determining whether disclosure of confidential information will cause 'substantial harm to the competitive position' . . . an entity needs to show: (1) actual competition in the relevant market; and, (2) a likelihood of substantial competitive injury if the information w[as] released." *Id.*

The competitive injury portion of the test "is limited to harm flowing from the affirmative use of proprietary information by competitors," and this portion of the test "should not be taken to mean simply any injury to competitive position." *Id.* (quoting *Watkins v. U.S. Bureau of Customs & Border Prot.*, 643 F.3d 1189, 1195 (9th. Cir. 2011)). In *Colgate-Palmolive Company*,[17] the OOR concluded, in relevant part, that "information[, which] relates to internal financial structure and corporate business strategy" may be exempt from disclosure as confidential proprietary information because "disclosure of this information would allow a competitor to

---

[16] We note that Petitioners question the validity of *Eiseman*. This issue is discussed fully in Subsection (D), *infra*.

[17] "Although OOR's final determinations are not binding on this Court, we may rely upon them for their persuasive value." *Pennsylvanians for Union Reform v. Office of Admin.*, 129 A.3d 1246, 1256 n. 16 (Pa. Cmwlth. 2015).

evaluate the financial health or business strategies" of the entity at issue, "which could in turn harm [the entity's] ability to compete in the market." *Colgate-Palmolive Company* at 15.

"Relevant and credible testimonial affidavits may provide sufficient evidence in support of a claimed exemption." *Office of the Dist. Atty. of Phila. v. Bagwell*, 155 A.3d 1119, 1130 (Pa. Cmwlth. 2017). The affidavit or attestation "must be specific enough to permit this Court to ascertain how disclosure . . . would reflect that the records sought fall within the proffered exemptions." *W. Chester Univ. of Pa. v. Schackner*, 124 A.3d 382, 393 (Pa. Cmwlth. 2015). "[C]onclusory affidavits, standing alone, will not satisfy the burden of proof." *Bagwell*, 155 A.3d at 1130. Further, "an affidavit which merely tracks the language of the exception it presupposes is insufficient to demonstrate that the responsive records are exempt from disclosure." *Pa. State Police v. Muller*, 124 A.3d 761, 765 (Pa. Cmwlth. 2015).

Here, Petitioners submitted several affidavits and attestations as support for their assertion that the Disputed Records contain confidential proprietary information. We address the sufficiency of each Petitioners' affidavits and attestations in turn.

### (1) Golden Living

Golden Living argues that the affidavit it submitted is sufficient evidence to find that its Disputed Records are exempt from disclosure as confidential proprietary information. Golden Living submitted the affidavit of Krista Elmore (Elmore), a licensure specialist for Golden Gate National Senior Care, LLC. Elmore attested, in relevant part, as follows:

> 3. Between October 1, 2016 and February 1, 2017, the Golden Living [] operators transferred operations of the . . . Facilities . . . and such

17

transfer involved the execution by the parties of an Operations Transfer Agreement ("OTA"). Effective as of the same date as the OTA, Golden Living's affiliated property owners leased the real property to the [n]ew [o]perators.

. . .

6. The [transfer of ownership] [a]pplications submitted by these [n]ew [o]perators contain information that is confidential and not publicly accessible.

7. The [a]pplications contain specific disclosures regarding a range of confidential and proprietary financial information and transaction terms, including: (i) the business structure of Golden Living and its affiliates; (ii) detailed biographical information regarding officers, directors and key employees; and (iii) the operational support structure of the [f]acilit[ies] and organization.

8. The [a]pplications include exhibits and other attachments that describe the manner in which the Golden Living [f]acilities obtained services needed to operate the [f]acilities and even include actual operating agreements.

. . .

20. Disclosure of the documents sought in [Item] [] 2 of the . . . Request would cause substantial harm to Golden Living[][c]enters operating in other States as well as the organizations whose information is contained in the [a]pplication.

(R.R. at 87a-91a.)

The OOR found that Elmore's affidavit did not explain how release of the Disputed Records would create actual competition, the second prong in determining whether disclosure of a record would cause substantial harm to Golden Living. Thus, the OOR concluded that the Elmore affidavit was not sufficient to demonstrate the Disputed Records were exempt from disclosure pursuant to Section 708(b)(11). We agree. Elmore's affidavit is conclusory in that it states that disclosure of the

18

Disputed Records would cause Golden Living to suffer substantial harm but does not specify **how** release of the Disputed Records would create actual competition in the long-term care marketplace. Elmore's affidavit merely tracks the language of the confidential proprietary information exemption and, as such, "is insufficient to demonstrate that the responsive records are exempt from disclosure." *Muller*, 124 A.3d at 765. Unlike the verification submitted by Guardian, specifically with regards to the minimum coverage ratio contained in its lease agreements, which is discussed more fully below, Elmore's affidavit lacks specificity and detail. The affidavit is not "specific enough to permit this Court to ascertain how disclosure of the [Disputed Records] would reflect that the records sought fall within the proffered exemptions." *Schackner*, 124 A.3d at 393. Describing the contents of the Disputed Records in extremely general terms and stating that release of these records would cause Golden Living to suffer competitive harm is not enough, even under a preponderance standard, to demonstrate that the records at issue are exempt from disclosure. Therefore, because Golden Living has not met its burden of demonstrating that release of its Disputed Records would cause it to suffer substantial competitive harm, the second prong of the definition of confidential proprietary information, Golden Living has not demonstrated that the Disputed Records contain confidential proprietary information exempt from disclosure.

(2) Providers

Providers argue that the attestations and affidavits they submitted provide sufficient evidence for finding their Disputed Records are exempt from disclosure as confidential proprietary information. Consolidated Providers submitted the virtually identical affidavits of Sam Feuer (Feuer) and Leibel Gutman (Gutman),

19

managers at several of its facilities.  Feuer and Gutman attested, in relevant part, as follows:

> 3.  The processing of our license applications was done on an expedited basis under circumstances where the out-going licensees were not participating in providing documentation or assistance with the process or in funding operations and there was a need to assure continuity of resident care and funding for operations.
>
> 4.  The documents withheld by the Department from our files are not the kind of documents that these legal entities would customarily release to the public.
>
> 5.  The Department . . . advises applicants for licenses and advised us that the financial and commercial documentation submitted as part of the license process were deemed confidential proprietary information.

(R.R. at 172a-73a.)  Consolidated Providers also submitted the affidavit of David Gamzeh (Gamzeh), another manager, who attested, in relevant part, that:

> 6.  The documents withheld by the Department contain specific disclosures regarding a range of confidential and proprietary information including:  (1) the business structure of each participant; (ii) detailed information about each participant's owners and key employees; and (iii) the operational support structure of each facility.
>
> 7.  The market for nursing home facilities is extremely competitive. Each of the participants competes with other licensees for residents and suppliers.
>
> 8.  Each of the participants has taken steps to maintain the confidentiality of the disputed documents and has been advised by the owners of the real estate involved that they object to the production of any documents to which they are signatories in order to protect the confidentiality of their terms.
>
> . . .

10. The [D]isputed [Records] contain financial and pricing information that drives each participant's competitive business model.

11. The [D]isputed [Records] have independent economic value because they offer parameters by which competitors could refine their operations to take away business and business opportunities from participants.

. . .

14. The disclosure of the commercial and financial documents of the legal entities will cause great business and economic harm to each of them by allowing competitors to gain the fruits of their labors and negotiations in developing their business models.

15. The information requested in the [D]isputed [Records] will reveal confidential information about each participant's business methods, systems and capabilities, including how each participant allocates resources and human capital to develop and manage its operations, which would permit competitors to mimic each participant's business model to improve their competitive position.

. . .

17. Negotiation of such documents for the operation of a health care facility is a complex process based on multiple variables relating to balancing the costs of care against available revenues to support those costs to reach business models that are sustainable and result in quality care outcomes and compliance with regulatory requirements, which, if disclosed to competitors would significantly harm each participant's competitive edge and permit competitors to seek to undercut their negotiated agreements with purported better terms and to steal their business models.

(R.R. at 175a-76a.)

Operations Providers submitted the attestation of Ephram Lahasky (Lahasky), its manager. Lahasky attested, in relevant part, that:

21

10. The Withheld [Records] were submitted only to D[epartment] and are not publicly accessible, are not readily available from other sources, and have not been disclosed to any third parties.

11. The Withheld [Records] establish each Provider's distinctive business or structure and organizational plan and rules of governance that were designed entirely for the purpose of obtaining a license from D[epartment] for the operation of a nursing facility. The Withheld [Records] also contain the management structure and operational authority of the Providers and the information regarding the planned operations of each facility. The Withheld [Records] contain assurances, warrantees, and other guarantees between the prior owner and new owner of the facility involved to ensure the efficient and legal transfer of operations of each Provider facility.

. . .

14. In order to protect the trade secrets contained in the Withheld [Records] as well as the confidential and proprietary nature of the Withheld [Records], the Withheld [Records] are not made available to the public. The Withheld [Records] are also not subject to access by almost all of the individual employees of the Provider. Only management, executive officers, and members (individuals) with an ownership interest in the Providers are in possession and have access to the Withheld [Records]. The Withheld [Records] have only been shared with our legal counsel and D[epartment] as part of the Application.

15. The Providers have also employed additional protective measures to ensure the secrecy and confidentiality of the Withheld [Records]. Each of the Provider's employees are required to abide by applicable non-disclosure agreements, contractual confidentiality requirements and company privacy requirements and expectations to maintain the confidentiality of the Withheld [Records].

16. The Withheld [Records] contain confidential and proprietary information including exclusive, fact-specific terms and provisions that were negotiated by the Providers, in conjunction with their legal counsel, as part of binding contractual arrangements with other entities or organization(s) who were party to the specific Agreements.

. . .

22

25. The information and documentation requested which comprise the Withheld [Records], if disclosed, would also reveal confidential information and trade secrets about each Provider's business methods, systems, and processes, including how each Provider has devised a formula or business plan to allocate resources, finances and labor to develop and manage its operations.

26. Our competitors would then be able to use the information contained in the Withheld [Records] adversely against the Providers to their disadvantage and undercut any competitive edge the Providers have been able to attain in their respective relevant markets.

27. Moreover, if our competitors obtain these "trade secrets" and proprietary information, our competitors will use [] the information and copy each Provider's distinct business model to improve their competitive position. They can also adjust their operational plans and business strategies to take business and business opportunities away from the Providers.

(*Id.* at 110a-13a.) Additionally, Operations Providers submitted the attestation of Leon E. LeBreton (LeBreton), the Chief Executive Officer of The Lancaster Group, LLC, which provides consulting services to long-term care facilities. LeBreton's attestation is substantially similar to that of Lahasky.

Based upon the foregoing affidavits and attestations, the OOR found that Providers met their burden of demonstrating that certain records within the Withheld Records were exempt from disclosure as confidential proprietary information. However, the OOR found that Consolidated Providers did not demonstrate that their leases contain confidential proprietary information, nor did they demonstrate that the ownership or employee biographical information was kept confidential or that its release would likely cause competitive harm. The OOR likewise found that Operations Providers did not demonstrate that release of their Disputed Records, which include their leases, ownership information, and employee biographical information, was likely to cause significant competitive harm.

23

We agree with the OOR that Providers have not demonstrated that release of their Disputed Records would cause competitive harm. Like Golden Living, the affidavits submitted by Providers do not explain **how** release of their leases, ownership or employee biographical information (the Disputed Records) would create actual competition in the long-term care marketplace. As such, the attestations and affidavits submitted by Providers are not "specific enough to permit this Court to ascertain how disclosure of the [Disputed Records] would reflect that the records [] fall within the proffered exemptions." *Schackner*, 124 A.3d at 393. The attestations and affidavits submitted by Providers merely track the definition of confidential proprietary information by stating that the Disputed Records were held confidentially and that their release would cause competitive harm to Providers, which is "insufficient to demonstrate that the responsive records are exempt from disclosure." *Muller*, 124 A.3d at 765.

Providers argue that the affidavits and attestations they submitted are substantially similar to the sworn verification submitted by Guardian and, therefore, the OOR erred by not finding Providers' leases were exempt in whole or in part, as it did with Guardian. However, the sworn verification submitted by Guardian is quite different from the attestations and affidavits submitted by Providers with respect to leases. Guardian submitted the sworn verification of Brian Rendos (Rendos), Guardian's Chief Financial Officer. Rendos attested, in relevant part, that

> 9. Confidential leasing agreements are also included with Guardian's Licensing Submissions, which include confidential information with respect to minimum rent coverage ratios. The rent coverage ratios are derived from a formula that compares the tenant's net operating income from the facilities (essentially the tenant's earnings before interest, taxes, depreciation, amortization, rent, and management fees) to the base rent for the facilities.

24

(Final Determination at 22-23.) The OOR concluded that the minimum coverage ratios can be redacted from Guardian's leasing agreements, but that the leases must otherwise be provided.

The sworn verification submitted by Guardian identifies a specific ratio, derived from a specific formula utilized by Guardian to calculate its minimum rent coverage, which is set forth within the lease agreements. The sworn verification submitted by Guardian identifies the **specific** information within the lease agreements that constitutes confidential proprietary information, the release of which would cause Guardian to suffer competitive harm. Moreover, only the minimum coverage ratio was redacted; the entire lease was **not** exempt. The attestations and affidavits submitted by Providers do not identify what specific information in the lease agreements would cause them to suffer competitive harm if released. Without this, there was no explanation as to how competitors could affirmatively use the information to the competitive harm of Providers, *see Eiseman*, 85 A.3d at 1128, or how the release of such information could cause competitive harm by disclosing a "corporate business strategy," *Colgate-Palmolive Company* at 15.

Similarly, within the broad category of ownership and employee biographical information, Providers did not identify the specific type of information which would result in competitive harm if released. Unlike an operations agreement detailing an entity's business structure, ownership or employee biographical information, by itself, is not facially proprietary and does not reveal a "corporate business strategy." *Id.* The affidavits and attestations submitted by Providers do not demonstrate how ownership or employee biographical information could affirmatively be used by competitors to Providers' disadvantage. *See Eiseman*, 85 A.3d at 1128.

25

Accordingly, in the absence of evidence of **how** release of the Disputed Records would cause Providers to suffer competitive harm, we must affirm the OOR's finding that Providers have not demonstrated that the Disputed Records are exempt as confidential proprietary information.

### C. Whether this Court should remand this matter for the OOR to determine whether the Disputed Records contain trade secrets.

Petitioners contend that despite asserting before the OOR that the Withheld Records also contain trade secrets, in addition to confidential proprietary information, the OOR made no specific findings regarding the trade secret exemption. Operations Providers argue that the OOR "has previously conferred 'trade secret' status on selected portions of contracts that if disclosed would cause damage to a party's competitive interest" and that "[b]ased upon the evidence of record, this [] Court should find that the Withheld [Records], including the lease agreements, constitute trade secrets and are exempt from disclosure." (Operations Providers' Br. at 24.) Alternatively, Petitioners argue we should remand this matter for the OOR to make specific findings regarding the trade secret exemption.

Requesters respond that the OOR did consider the trade secret exemption as the OOR stated "that the [W]ithheld [Records] were not exempt under Section 708(b)(11) [of the RTKL], subsuming both confidential proprietary information and trade secrets." (Requesters' Br. at 41.) Specifically, Requesters argue:

> since the test for trade secrets is similar to and contains elements of the test for confidential proprietary information, including "substantial secrecy and competitive value," it follows logically that the OOR deemed that the Petitioners failed to prove the [W]ithheld [Records] were exempt under the trade secrets portion of [the] Section 708(b)(11) exemption.

(*Id.* at 41-42.) Requesters further argue that even if the OOR did not reach the trade secrets issue, "Petitioners were unable to prove the confidential proprietary information exemption using what they assert were portions of the trade secret test" and, therefore, Petitioners "will be similarly unable [to] prove exemption under the actual trade secret test." (*Id.* at 42.)

As stated above, Section 708(b)(11) of the RTKL exempts from disclosure confidential proprietary information and trade secrets. The term "[t]rade secret" is defined by Section 102 of the RTKL as follows:

> Information, including a formula, drawing, pattern, compilation, including a customer list, program, device, method, technique or process that:
>
> (1) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

65 P.S. § 67.102. "A 'trade secret' must be 'an actual secret of peculiar importance to the business and constitute competitive value to the owner.'" *Crouthamel v. Dep't of Transp.*, 207 A.3d 432, 438-39 (Pa. Cmwlth. 2019) (quoting *Parsons v. Pa. Higher Educ. Assistance Agency*, 910 A.2d 177, 185 (Pa. Cmwlth. 2006)). Pennsylvania courts have consistently applied the following test to determine whether information constitutes a trade secret:

> (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others in the business; (3) the extent of measures taken to guard the secrecy of the information; (4) the value of the information to [an individual's] business and to competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or

27

difficulty with which the information could be properly acquired or duplicated by others.

*Schackner*, 124 A.3d at 392 n.15 (quoting *Eiseman*, 85 A.3d at 1126.). "The most critical criteria [of the above test] are 'substantial secrecy and competitive value.'" *Smith on behalf of Smith Butz, LLC v. Dep't of Envtl. Prot.*, 161 A.3d 1049, 1064 (Pa. Cmwlth. 2017) (quoting *Eiseman*, 85 A.3d at 1126).

We first address Petitioners' argument that the OOR failed to determine whether the Withheld Records contained trade secrets. In its Final Determination, the OOR acknowledged that "[t]he primary exemption raised by each responding party is Section 708(b)(11) of the RTKL." (Final Determination at 20.) The OOR then explained that Section 708(b)(11) exempts from disclosure records that contain trade secrets or confidential proprietary information. The OOR defined each term and outlined the requisite test for each exemption. The OOR found that Petitioners failed to demonstrate that the Withheld Records were exempt from disclosure because they did not demonstrate that release of the records would cause competitive harm.

Competitive harm is the second prong in the definition of confidential proprietary information and the fourth factor in the test to determine whether information constitutes a trade secret. Competitive harm is thus a factor in determining both whether a record constitutes confidential proprietary information or a trade secret. The OOR, rather than engaging in two separate inquiries, apparently conflated its analysis of whether the Withheld Records contained confidential proprietary information **and** trade secrets. *Compare* 65 P.S. § 67.102 *with Schackner*, 124 A.3d at 392 n.15. Therefore, the OOR did analyze whether each Petitioner met its burden of demonstrating that the Withheld Records contained trade secrets.

28

We now turn to whether the Disputed Records contain trade secrets. As set forth above, neither Golden Living, nor Providers, demonstrated that release of the Disputed Records would result in competitive harm. Thus, Petitioners failed to demonstrate that the Disputed Records were exempt as trade secrets. Further, with respect to the ownership and employee biographical information specifically, it is not evident without explanation how this information is "an 'actual secret of peculiar importance to the business and constitute[s] competitive value to the owner,'" *Crouthamel*, 207 A.3d at 438-39 (citation omitted). In the absence of specific evidence, we cannot conclude that this information would constitute a trade secret. Accordingly, for the foregoing reasons, we conclude that the OOR did consider whether the Disputed Records contain trade secrets and affirm its finding that Petitioners did not demonstrate that the records were exempt under the trade secret exemption.

*D. Whether our precedent in Eiseman should be reexamined and overturned.*

Petitioners argue that the efforts test set forth by this Court in *Eiseman* is inconsistent with the legislative intent and the rules of statutory construction and, as such, "the [e]fforts [t]est is the wrong legal standard to determine the meaning of 'confidential.'" (Consolidated Providers' Br. at 13.) Specifically, Consolidated Providers assert that

> [t]he [e]fforts [t]est adds a requirement from the separate [t]rade [s]ecret definition to the statutory definition [of confidential proprietary information] contrary to the statutory scheme, rules of statutory construction, legislative history; State and Federal case[]law, including that regarding [e]xemption 4 [of the FOIA] and similar provisions of other States' open records laws.

29

(*Id.*) Petitioners assert that the RTKL is based upon the FOIA and, therefore, we should look to federal interpretation of the term "confidential" under the FOIA to determine the meaning of the term for purposes of the RTKL. At argument before this Court, Counsel for Consolidated Providers pointed to the United States Supreme Court's decision in *Food Marketing Institute v. Argus Leader Media*, __ U.S. __, 139 S. Ct. 2356 (2019), as the case from which we should glean our definition of the term "confidential." In *Food Marketing Institute*, the Supreme Court examined what is referred to as exemption 4 of the FOIA, which exempts records containing "trade secrets and commercial or financial information obtained from a person and privileged or confidential" from disclosure. 5 U.S.C. § 552(b)(4). The Supreme Court concluded that "[a]t least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of [e]xemption 4." *Id.*, __ U.S. at __, 139 S. Ct. at 2366.

Requesters respond that we should follow the doctrine of stare decisis and apply the efforts test set forth in *Eiseman* as it is still good law. Requesters argue that exemption 4 of the FOIA is not analogous to Section 708(b)(11) of the RTKL. Requesters assert that there are significant differences between exemption 4 of the FOIA and Section 708(b)(11) of the RTKL because the FOIA "lumps trade secrets and commercial financial information together, using the words 'privileged or confidential' to describe the trade secrets and commercial or financial information." (Requesters' Br. at 27.) Requesters admit that while exemption 4 of the FOIA is similar to Section 708(b)(11) of the RTKL, they are "not identical" and, therefore, the "FOIA case[]law on the definition of its exemption is less persuasive to a court interpreting the RTKL confidential proprietary information exemption." (*Id.*) As

30

such, Requesters argue that "the conditions precedent are not met to warrant the OOR or this Court looking to [the] FOIA and its case[]law as persuasive authority." (*Id.* at 30.)

"Stare decisis binds us to follow decisions of our own [C]ourt until they are either overruled or compelling reasons persuade us otherwise." *State Farm Mut. Auto. Ins. v. Dep't of Ins.*, 720 A.2d 1071, 1073 (Pa. Cmwlth. 1998). Here, we see no reason to revisit the efforts test set forth in *Eiseman*. Although *Eiseman* was reversed by the Pennsylvania Supreme Court in *Department of Public Welfare v. Eiseman*, 125 A.3d 19 (Pa. 2015), the efforts test was left undisturbed as the Supreme Court did not reach the issue of whether the records at issue contained confidential proprietary information. As we explained in *Crouthamel*,

> *Eiseman* involved an RTKL request for any and all documents that set forth the rate of payment, including but not limited to capitation rates, that the Department of Public Welfare (DPW) paid to Medicaid managed care organizations (MCOs) to provide coverage to recipients in southeastern Pennsylvania. This request included the rates paid for dental services pursuant to established dental procedure codes and any payments made by an MCO for such services. DPW refused to provide the requested information on the basis that the rates constituted trade secrets and/or confidential proprietary information that was protected from disclosure by, *inter alia*, the [Uniform] Trade Secrets Act[18] [(Trade Secrets Act)] and section 708(b)(11) of the RTKL. The OOR, however, granted an appeal by the [r]equesters and directed DPW to disclose the records concluding that the records constituted financial records to which the exception in section 708(b)(11) did not apply (section 708(c) of the RTKL, 65 P.S. § 67.708(c), provides that "[t]he exceptions set forth in subsection (b) shall not apply to financial records.").
>
> On appeal, this Court affirmed the final determination of the OOR relating to disclosure of capitation rates but reserved the final determination relating to disclosure of the rates paid by MCOs.

---

[18] Uniform Trade Secrets Act, 12 Pa. C.S. §§ 5301-5308.

31

Regarding the former, we agreed with the OOR that the capitation rates constituted financial records to which the exception for trade secrets/confidential proprietary information set forth in section 708(b)(11) of the RTKL did not apply. However, we held that the Trade Secrets Act could act as "stand-alone statutory basis for protection," *i.e.*, a "state law that takes precedence over the provisions in the RTKL," including section 708(c). *Eiseman*, 85 A.3d at 1125. Nevertheless, we ultimately concluded that the MCOs failed to establish that such rates constituted trade secrets under the Trade Secrets Act. Subsequent to our decision, DPW disclosed the capitation rates to [r]equesters. Regarding the latter, we concluded that the MCO rates were not financial records because these rates were not disbursed by an agency, namely DPW, but instead were paid by the MCOs to providers. Additionally, we held that such rates constituted confidential proprietary information that was protected from disclosure by section 708(b)(11) of the RTKL.

The dissenting opinion disagreed with the [m]ajority's conclusion that the MCO rates were not financial records simply because they were disbursed by the MCOs rather than DPW and, consequently, that the trade secrets/confidential proprietary information exception could apply to the same. Further, the dissent disagreed with the [m]ajority to the extent that it concluded that the Trade Secrets Act constituted an intendent, "stand-alone statutory basis for protection" from disclosure. *Id*. at 1138. Our Supreme Court in *Eiseman* agreed with the dissenting opinion and reversed this Court's decision as to the MCO rates.

207 A.3d at 438 n.6. Because our Supreme Court did not reach the issue of whether the records at issue in *Eiseman* contained confidential proprietary information, it left undisturbed our discussion of the efforts test, defining the word "confidential."

Further, the present matter presents no compelling reason for us to revisit *Eiseman* because the efforts test is not outcome determinative here. As stated above, Section 708(b)(11) of the RTKL exempts from disclosure confidential proprietary information and trade secrets. In addition to demonstrating that information was kept confidential, the tests for determining whether a record contains confidential proprietary information or a trade secret both require us to examine whether release

32

of the information would cause competitive harm. For the reasons set forth above, Petitioners have not demonstrated competitive harm would result from the release of the Disputed Records. As such, the efforts Petitioners took to keep the records confidential is not outcome determinative. Therefore, we see no compelling reason to revisit *Eiseman* in this case because Petitioners have not met the other requirements for demonstrating the Disputed Records contain confidential proprietary information or trade secrets.

> *E. Whether the OOR erred by ordering the release of records without ordering Department to redact the records to protect personal privacy rights.*

Petitioners argue that the OOR's Final Determination is inconsistent with the Supreme Court's decision in *Pennsylvania State Education Association v. Department of Community and Economic Development.*, 148 A.3d 142 (Pa. 2016) (*PSEA*), in that the OOR appears to be ordering the release of records without ordering Department to first redact the records to protect personal privacy rights. While Requesters state that "[t]he documents ordered to be released need not be redacted," (Requesters' Br. at 39), Requesters did not make any specific arguments regarding redactions to protect personal privacy rights. However, at argument before this Court, Counsel for Requesters indicated that Requesters did not challenge the redactions made by Department to protect personal interests and does not challenge similar redactions being made to the records the OOR ordered to be released.

While records held by a state agency are presumed to be public records, our Supreme Court in *PSEA* explained that

> nothing in the RTKL suggests that it was ever intended to be used as a tool to procure personal information about private citizens or, in the

33

worst sense, to be a generator of mailing lists. Public agencies are not clearinghouses of "bulk" personal information otherwise protected by constitutional privacy rights. While the goal of the legislature to make more, rather than less, information available to public scrutiny is laudable, the constitutional rights of the citizens of this Commonwealth to be left alone remains a significant countervailing force.

148 A.3d at 158. In *PSEA*, the Supreme Court once again reaffirmed its longstanding holding that "[t]he right to informational privacy is guaranteed by Article 1, Section 1 of the Pennsylvania Constitution,[19] and may not be violated unless outweighed by a public interest favoring disclosure." *Id.* The General Assembly codified some informational privacy rights into the RTKL, exempting from disclosure, in relevant part,

> [t]he following personal identification information:
>
>> (A) A record containing all or part of a person's Social Security number, driver's license number, personal financial information, home, cellular or personal telephone numbers, personal e-mail addresses, employee number or other confidential personal identification number[s].
>> (B) A spouse's name, marital status or beneficiary or dependent information.
>> (C) The home address of a law enforcement officer or judge.

65 P.S. § 67.708(b)(6)(i)(A-C). That being said, "constitutionally protected privacy interests must be respected even if no provision of the RTKL speaks to protection of those interests." *PSEA*, 148 A.3d at 156. Accordingly, before a government agency, such as Department, "may release personal information, it must first conduct a balancing test to determine whether the right of informational privacy outweighs the

---

[19] Article 1, section 1 of the Pennsylvania Constitution provides that "[a]ll men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness." PA. CONST. art. 1, § 1.

34

public's interest in dissemination." *Reese v. Pennsylvanians for Union Reform*, 173 A.3d 1143, 1159 (Pa. 2017). Our Supreme Court recently reaffirmed its holding in *PSEA* and the balancing test in *City of Harrisburg v. Prince*, 219 A.3d 602 (Pa. 2019).

The OOR ordered Department to provide Requesters with the Disputed Records within 30 days. The OOR's order that the Withheld Records be disclosed did not specifically order the records to be redacted to protect personal privacy rights. However, such redactions are clearly required, as recognized by Requesters' concession at argument, and the Supreme Court's recent decision in *Prince.* Therefore, we will clarify that Department must release to Requesters the Disputed Records, consistent with this Opinion, within 30 days with appropriate redactions to protect personal privacy rights, consistent with the United States and Pennsylvania Constitutions, the RTKL, *Prince*, *Reese*, and *PSEA*.

### F. Whether Item 4 is sufficiently specific under the RTKL.

Providers assert that Item 4 is not sufficiently specific under the RTKL. They assert that "[t]he 48-day timeframe cannot rescue this otherwise overbroad Request or make it any less 'a fishing expedition.'" (Consolidated Providers' Br. at 55 (citation omitted).) Providers note that the OOR, in finding that Item 4 is sufficiently specific, relied on this Court's decision in *Baxter*. Providers, citing this Court's decision in *Office of Attorney General v. Philadelphia Inquirer*, 127 A.3d 57 (Pa. Cmwlth. 2015), argue that since *Baxter*, this Court has used a higher standard for evaluating whether a RTKL request is sufficiently specific, and that Item 4 does not meet this higher standard. Consolidated Providers ask this Court to

> clarify here that a short timeframe alone can never rescue a [r]equest
> that does not on its face specifically establish that the information

35

sought falls with the RTKL's definition of a [r]ecord and that the subject matter of the records relates to agency operations; and, that *Baxter* cannot be read as an exception to the higher level of specificity required by *Phila[delphia] Inquirer*.

(Consolidated Providers' Br. at 57.)

Requesters respond by asserting that Item 4 is sufficiently specific under Section 703 of the RTKL. Requesters argue that

> [h]ere, there are only four individuals with whom the Request is concerned, severely limiting the scope of the Request. Similarly constrained is the extremely short period of time of about a month and a half. There can be no confusion with this description as to the identities of the records sought which enables the D[epartment] to ascertain which records are being requested and produce them. This is what is required by the appropriate RTKL section . . . [. T]herefore the Request was sufficiently specific.

(Requesters' Br. at 45 (citations omitted).)

As stated above, Section 703 of the RTKL provides that "[a] written request should identify or describe the records with sufficient specificity to enable the agency to ascertain which records[20] are being requested." 65 P.S. § 67.703. In determining whether a request is sufficiently specific, this Court must "examin[e] the extent to which the request sets forth (1) the subject matter of the request; (2) the scope of documents sought; and (3) the timeframe for which records are sought." *Pittsburgh Post-Gazette*, 119 A.3d at 1124. "The subject matter of the request must identify the 'transaction or activity' of the agency for which the record is sought." *Id.* at 1125. With respect to the requirement that a request must set forth the scope

---

[20] In relevant part, the RTKL defines "[r]ecord" as "[i]nformation, regardless of physical form or characteristics, that documents a transaction or activity of an agency and that is created, received or retained pursuant to law or in connection with a transaction, business or activity of the agency." 65 P.S. § 67.102.

36

of documents sought, the request must "identify a discrete group of documents either by type . . . or recipient." *Bagwell*, 155 A.3d at 1143 (quoting *Pittsburgh Post-Gazette*, 119 A.3d at 1125). "The fact that a request is burdensome does not deem it overbroad." *Dep't of Envtl. Prot. v. Legere*, 50 A.3d 260, 265 (Pa. Cmwlth. 2012).

In the present matter, the OOR relied on our decision in *Baxter* in finding that Item 4 was sufficiently specific. In *Baxter*, the requester filed a RTKL request with a school district requesting "'[a]ll emails sent and received between Oct[ober] 1 and Oct[ober] 31' for email addresses of nine school board members, the school district superintendent and the general school board address." 35 A.3d at 1260. The school district denied the request, concluding that the request was not sufficiently specific. The requester appealed to the OOR, which concluded that the request was sufficiently specific because it "identified the type of records sought, the parties involved and a timeframe, and was sufficiently specific to allow the [s]chool [d]istrict to identify at least 3,500 responsive records." *Id.* at 1261. The school district appealed the OOR's final determination to this Court, arguing that the request was not sufficiently specific under Section 703 of the RTKL because, among other reasons, it did not "identify the subject matter of the requested emails." *Id.* at 1264. We concluded that "the request here is limited in terms of the type of record requested, the timeframe and the number of email addresses" and that a timeframe of 30 days "was obviously sufficiently specific because the [s]chool [d]istrict has identified potential records included within the request." *Id.* at 1265. We further concluded that "unlike in *Mollick* [*v. Township of Worcester*, 32 A.3d 859 (Pa. Cmwlth. 2011)], the request here does not constitute an unreasonable burden, [and] it is sufficiently specific to comply with Section 703 of the RTKL." *Baxter*, 35 A.3d at 1265. Accordingly, we ordered that "all emails from the requested email

37

accounts" that are connected with "'a transaction, business or activity'" of the school district be released. *Id.*

In contrast, the requester in *Mollick* sought in relevant part: "(1) all emails between the [township s]upervisors and the [t]ownship employees regarding any [t]ownship business and/or activities for the past one and five years; and (2) all emails between the [s]upervisors and the [t]ownship employees regarding any [t]ownship business and/or activities for the past one and five years." 32 A.3d at 871. We held that this request was not sufficiently specific because the "[r]equester fail[ed] to specify what category or type of [t]ownship business or activity for which he is seeking information" and "it would place an unreasonable burden on an agency to examine all its emails for an extended time period without knowing, with sufficient specificity, what [t]ownship business or activity is related." *Id.*

As noted by Providers, after *Baxter*, this Court issued its decision in *Philadelphia Inquirer*. The requester there filed a RTKL request with the Pennsylvania Office of Attorney General (OAG) "seeking copies of all emails that were 'of a personal nature and involve[] pornographic or otherwise inappropriate material' to or from the accounts of three former OAG employees from 2009 until they left the OAG." *Phila. Inquirer*, 127 A.3d at 58-59. OAG denied the request, concluding in relevant part, that the request was not sufficiently specific under Section 703. The requester appealed to this Court, where "[t]he core issue" was "whether personal emails are public records within the meaning of the RTKL so that the agency is compelled to produce them under a RTKL request because they document the conduct of that agency." *Id.* at 60-61. We applied the test set forth in *Pittsburgh Post-Gazette* and concluded that the "requested emails are not disclosable as records under the RTKL merely because they were sent or received using an OAG

email address or by virtue of their location on an OAG computer." *Id.* at 63. We explained that "[f]or emails to qualify as records 'of' an agency, we only look to see if the subject-matter of the records relate to the agency's operations." *Id.*

Here, Item 4 requested: "[a] copy of **all correspondence** sent and received (including text messages and written memos) by Acting Department Secretary Dr. Rachel Levine, Communications Director April Hutchenson, Press Secretary Nate Wardle, and Nursing Home Division Director Susan Williamson, between April 1, 2018 to present [(May 18, 2018)]." (R.R. at 519a (emphasis added).) To determine whether Item 4 is sufficiently specific under Section 703 of the RTKL, we must apply the three-part test set forth in *Pittsburgh Post-Gazette*. First, we must examine the extent to which Item 4 sets forth a subject matter, meaning the extent to which Item 4 sets forth a specific transaction or activity upon which the RTKL request is related. *See Pittsburgh Post-Gazette*, 119 A.3d at 1124. Item 4 does not set forth a subject matter as Item 4 does not identify a specific transaction or activity to which the request is related. Rather, Item 4 requests **all correspondence** from four named individuals without regard to a specific subject matter within those communications. Second, we examine the extent to which Item 4 sets forth the scope of records sought. *Id.* Item 4 does not limit the types of correspondence sought as Item 4 requests all correspondence but does narrow the scope of records by seeking correspondence sent and received by four specific individuals. Lastly, we examine the extent to which Item 4 sets forth a timeframe of records sought. *Id.* Item 4 seeks records for a specific 48-day timeframe.

Based upon the foregoing, the OOR concluded that while Item 4 lacks a subject matter, Item 4 "is directly comparable to the request at issue in *Baxter* in both scope and timeframe and is therefore sufficiently specific." (Final

39

Determination at 16.) We disagree. The request in *Baxter* was much more limited than Item 4 in the present matter. In *Baxter*, the requester sought only **emails, from specific official email addresses** of local school board members, over a limited period of time. Here, Item 4 requests **all correspondence,** not just emails, but specifically including text messages, and written memos, sent and received by four named individuals, specifically the Acting Secretary, Communications Director, Press Secretary, and Nursing Home Division Director of Department, over a 48-day timeframe.

*Baxter* does not stand for the proposition that a RTKL request that is limited to a short timeframe is always, by itself, sufficiently specific. When *Baxter* is read in the context of our other opinions, such as *Mollick* and *Philadelphia Inquirer*, it is clear that the timeframe of records sought is **only one** of the factors we must consider in determining whether a RTKL request is sufficiently specific. Turning back to *Baxter*, we stated that:

> Just as in *Mollick*, the request here is **limited in terms of the type of record requested, the timeframe and the number of email addresses.** Unlike in *Mollick*, though, the request here was not for years but for 30 days and the request was obviously sufficiently specific because the [s]chool [d]istrict has already identified potential records included within the request. Because, unlike in *Mollick*, the request here does not constitute an unreasonable burden, it is sufficiently specific to comply with Section 703 of the RTKL.

35 A.3d at 1265 (emphasis added). Thus, in *Baxter*, this Court considered factors other than time frame of the request when determining whether the request was sufficiently specific, such as the type of record requested (emails), the scope of forms of communications involved (specific email addresses), and the fact that the agency was able to identify potential responsive records. In *Mollick*, we considered time, in

40

addition to whether the request identified a transaction or business activity upon which the request was based. In *Philadelphia Inquirer*, we explained that the subject matter of requested emails may be necessary to determine whether the emails are an agency record. Therefore, the fact that a RTKL request is limited to a short timeframe does not end the analysis of whether the request is sufficiently specific under Section 703.

Here, in contrast to *Baxter* and *Mollick*, where the requests were limited to emails, Item 4 requests **all correspondence** through all mediums, electronic and written, **sent and received** by four named individuals over a 48-day timeframe. We are aware that the secretary of a state agency is likely to send and receive more communications in a 30-day time period than a member of a local school board and that these communications are likely to contain exempt information. Therefore, as in *Mollick*, Item 4 "place[s] an unreasonable burden" on Department to compile **all correspondence** sent and received by the highest tier of employees at Department "without knowing, with sufficient specificity, what [] business or activity the request is related." 32 A.3d at 871. Thus, the OOR erred as a matter of law in finding Item 4 sufficiently specific.[21]

We also note that the breadth of Item 4 gives this Court pause considering the plethora of constitutionally protected information likely to be contained in the responsive records to Item 4. While we recognize that "[t]he RTKL does not require that [] third parties receive notice that a determination affecting their constitutional rights has been appealed," a government agency, such as Department, must "be

---

[21] Petitioners ask that in the event we conclude Item 4 is sufficiently specific, we remand this item to the OOR to remand to Department to make appropriate redactions to the responsive records due to the breath of records requested by Item 4. Based upon the reasoning set forth above, we conclude that Item 4 is not sufficiently specific under Section 703 of the RTKL; therefore, the issue of whether Item 4 should be remanded is moot.

attentive to constitutional interests in the RTKL context." *W. Chester Univ. of Pa. v. Rodriguez*, 216 A.3d 503, 510-11 (Pa. Cmwlth. 2019). That being said, for the reasons set forth above, we conclude that Item 4 is not sufficiently specific.

## III. Conclusion

Based upon the foregoing reasons, we conclude that Golden Living and Providers have not demonstrated that the Disputed Records are exempt from disclosure under the RTKL. Accordingly, Department is required to release to Requesters the Disputed Records, consistent with this Opinion, within 30 days of the date of this Opinion with appropriate redactions, as required by law, to protect personal privacy rights. As to Item 4, we conclude that this item is not sufficiently specific under the RTKL and, as such, strike this item as insufficient, meaning, that responsive records to Item 4 need not be provided to Requesters.

_____
**RENÉE COHN JUBELIRER,** Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Keystone Nursing and Rehab of : 
Reading, LLC, Keystone Nursing and : 
Rehab of Lancaster, LLC, Phoenixville : 
Care, LLC, Rosemont Care, LLC, : 
Stenton Care, LLC, Harborview : 
Rehabilitation and Care Center at : 
Doylestown, LLC, Harborview : 
Rehabilitation and Care Center at : 
Lansdale, LLC, The Meadows at : 
Harrisburg for Nursing and : 
Rehabilitation, LLC, The Meadows at : 
Camp Hill for Nursing and : 
Rehabilitation, LLC, The Meadows : 
at East Mountain-Barr for Nursing and : 
Rehabilitation, LLC, The Meadows at : 
Gettysburg for Nursing and : 
Rehabilitation, LLC, The Meadows at : 
Pottsville for Nursing and : 
Rehabilitation, LLC, The Meadows at : 
Sunbury for Nursing and Rehabilitation, : 
LLC, The Meadows at Scranton for : 
Nursing and Rehabilitation, LLC, : 
The Meadows at Stroud for Nursing and : 
Rehabilitation, LLC, The Meadows at : 
Summit for Nursing and Rehabilitation, : 
LLC, The Meadows at Tunkhannock for : 
Nursing and Rehabilitation, LLC, and : 
The Meadows at West Shore for : 
Nursing and Rehabilitation, LLC, : 
                            Petitioners : 
                            : 
                v.             :    No. 1631 C.D. 2018
                            : 
Daniel Simmons-Ritchie and PA Media : 
Group, : 
                           Respondents : 


Golden Living, : 
                            Petitioner :

|  | : |  |
| v. | : | No. 1692 C.D. 2018 |
|  | : |  |
| Daniel Simmons-Ritchie and The PA | : |  |
| Media Group, | : |  |
| Respondents | : |  |

|  | : |  |
| Monroeville Operations, LLC, | : |  |
| Mt. Lebanon Operations, LLC, | : |  |
| Murrysville Operations, LLC, and | : |  |
| South Hills Operations, LLC, | : |  |
| Petitioners | : |  |
|  | : |  |
| v. | : | No. 1696 C.D. 2018 |
|  | : |  |
| Daniel Simmons-Ritchie and | : |  |
| PA Media Group, | : |  |
| Respondents | : |  |

# O R D E R

**NOW**, January 3, 2020, the Final Determination of the Pennsylvania Office of Open Records dated December 3, 2018, is **AFFIRMED** in part and **REVERSED** in part. The Department of Health is hereby **ORDERED** to release the Disputed Records consistent with this Court's Opinion in the above-captioned matters.

_____
**RENÉE COHN JUBELIRER,** Judge